**Dawn Jeanette PETERSON, Plaintiff,**

v.

**Dr. Kenneth L. CARTER, Defendant.**

Civ. No. 3203.

United States District Court
W. D. Wisconsin.

April 2, 1960.

Carroll E. Metzner, Madison, Wis., for plaintiff.

D. V. W. Beckwith, Madison, Wis., for defendant.

STONE, District Judge.

This is a malpractice action resulting from surgery performed on plaintiff at the Beloit Hospital, Beloit, Wisconsin, on January 29, 1957.

Plaintiff's complaint alleged that defendant performed a thyroid operation in which he negligently removed or damaged her parathyroid glands, and that as a result, plaintiff, who is now thirty years of age, has a permanent deficiency of thyroid and will be required to receive medication for the remainder of her life.

At the close of the evidence the defendant moved for a directed verdict dismissing the complaint on the ground that there was no proof in the record of negligence on the part of the defendant, as alleged in the complaint, which was a proximate cause of the plaintiff's injury and damage. The Court withheld its ruling on defendant's motion, advising defendant's counsel that the same motion could be renewed after the return of the verdict. No verdict was returned by the jury.

After the jury had deliberated over eight hours, it advised the Court that it was hopelessly deadlocked and could not agree on a verdict. The jury was discharged, and the defendant then renewed his motion that the complaint be dismissed for the reasons set forth in his motion for a directed verdict; that there was no evidence of negligence on the part of the defendant which was a proximate cause of plaintiff's injury and damage.

In Davis v. Virginian Railway Co., 1960, 361 U.S. 354, 80 S.Ct. 387, 389, 4 L.Ed.2d 366, the United States Supreme Court said: "Proof of malpractice in effect requires two evidentiary steps: evidence as to the recognized standard of the medical community in the particular kind of case, and a showing that the physician in question negligently departed from this standard in his treatment of plaintiff."

The rule of law is well established in Wisconsin by an unbroken line of authorities, that a physician or surgeon called to prescribe and professionally treat a patient as a physician and surgeon, is bound to bring to his aid and relief such care and skill as is ordinarily possessed and used by physicians and surgeons of the same system or school of practice, in the vicinity or locality in which the physician resides, having reference to the advanced state of medical or surgical science at the time. Rost v. Roberts, 180 Wis. 207, 192 N.W. 38; Kuehnemann v. Boyd, 193 Wis. 588, 214 N.W. 326, 215 N.W. 455; Nelson v. Newell, 195 Wis. 572, 217 N.W. 723; Holton v. Burton, 197 Wis. 405, 222 N.W. 225; Gates v. Fleischer, 67 Wis. 504, 30 N.W. 674; Hrubes v. Faber, 163 Wis. 89, 157 N.W. 519.

In Stenkowiczki v. Lytle, 171 Wis. 625, 177 N.W. 849, the Supreme Court of Wisconsin held in a malpractice case that negligence consists of the adoption of a wrong procedure or the negligent application of proper procedure.

The degree of care and skill required of a physician and surgeon, and the question of his failure to exercise such care and skill, can only be proved by the testimony of experts.

In Kuehnemann v. Boyd, 193 Wis. 588, at page 592, 214 N.W. 326, at page 327, it was held that:

"In order to hold him (the physician) liable, the burden is upon the plaintiff to show that he failed in the requisite degree of care and skill. That degree of care and skill can only be proved by the testimony of experts. Without such testimony the jury has no standard which enables it to determine whether the defendant failed to exercise the de-

gree of care and skill required of him."

■ The determination of the question of the competency and qualifications of a physician or surgeon as an expert witness on the issues of the standard of care required of the defendant in a malpractice case, as of expert witnesses generally, is addressed to the judicial discretion of the trial judge. 8 A.L.R.2d 773; Potter v. Schleck, 9 Wis. 2d 12, 100 N.W.2d 559; Drott Tractor Company v. Kehrein, 275 Wis. 320, 81 N. W.2d 500; Andersen v. Andersen, 8 Wis. 2d 278, 99 N.W.2d 190.

Dr. Nathan Flaxman of Chicago was the only doctor who testified on behalf of plaintiff in support of her claim that defendant was negligent, and that his negligence was the cause of plaintiff's injuries and damages.

■ Dr. Flaxman has practiced in Chicago, Illinois, since he finished his internship in 1933. He never had a residency in surgery. He does not hold himself out as a surgeon. Practically all of his practice has been as a physician. He performed no major operation since 1948. Before that time he did some surgery but his practice was divided about 70% to 75% medical practice, and 25% to 30% surgery. He has never qualified for any of the surgical societies or organizations. He is certified by the American Board of Internal Medicine as an internist. His only contact with thyroid surgery in Wisconsin is limited to his alleged observation of some of his former students, to whom he did not teach surgery, and whose names he could not recall, but whom he thought resided in the cities of Kenosha, Racine, Wausau, Eau Claire and Marshfield, all in Wisconsin.

He had been at the University of Wisconsin Hospital on two occasions, but said he was too tired to attend any thyroid operations. He had no recollection of any specific technique used by the surgeons at this hospital on such operations. The Court is thoroughly satisfied from the evidence that he lacked the qualifications of an expert on thyroid surgery. He lacked the knowledge and experience to qualify as an expert witness, and was incompetent to testify as an expert on the issues involved in this action. His answers on cross-examination were evasive and unreliable, bearing on the ridiculous. His testimony, much of which was irrelevant to the issues involved herein, fails to establish in the slightest measure that Dr. Carter was negligent, or that his negligence was the cause of plaintiff's injuries and damages. He admitted that surgery was a proper method of treating Graves disease. He has not testified that surgery was an improper treatment. On cross-examination he disclosed his utter incompetency to testify as an expert witness in this action. A sample of his testimony on cross-examination follows:

"Q. Doctor, you say that the surgery described to you was not performed with the skill and care that surgeons use in this area. You are referring to Wisconsin? A. I am referring to the—well, in Chicago, the area—

"Q. Well, I asked if you were referring to Wisconsin? A. The entire state of Wisconsin?

"Q. Yes. A. Yes.

"Q. The southern half of Wisconsin? A. What is it?

"Q. The southern half of Wisconsin? A. Yes.

"Q. Are you familiar with the surgery performed in Wisconsin? A. Yes.

"Q. Who have you seen perform thyroidectomies in Wisconsin? In the southern half of Wisconsin? A. Some of my students—whose names evade me at the moment.

"Q. How long ago? A. Oh, as late as a year ago.

"Q. You can't remember any of the students' names? A. It isn't that I don't remember. I mean—

"Q. Have you seen any surgery performed in the University of Wis-

consin Hospital on Thyroids? A. I was here in November—

"Q. Did you see any thyroidectomies performed there? A. Could be. I looked around.

"Q. Well, did you, please? A. I could have. I mean—

"Q. Who did you see perform any operation? A. I don't remember the names of the surgeons.

"Q. Are you acquainted with any of the surgeons in Wisconsin?

"The Witness: May I qualify the answer to that a little bit?

"The Court: Well, you know whether or not you know any of the surgeons here in Madison.

"The Witness: A. I know them by sight, but their names escape me.

"Mr. Beckwith: Q. Well, do you know Dr. Gale? A. I could, if I saw him.

"Q. Do you know him by reputation? A. No.

"Q. Do you know Dr. Curreri? A. No.

"Q. Know him by reputation? A. No.

"Q. Have you watched any operations being performed in any of the other hospitals in Madison? A. Not in Madison, no.

"Q. In Beloit? A. In the Rockford area, yes.

"Q. In Beloit? A. Well, I thought Beloit was in the Rockford area.

"Q. I asked you in Beloit, please. Rockford is in Illinois. I asked you, please, if you saw any in Beloit? A. No.

"Q. Now, these students of yours whom you have seen operate within the past year in Wisconsin. Where did you see them operate? A. Let's see—in the past year I have been in Wisconsin in various places. I have been in Marshfield,—

"Q. We are talking about thyroidectomies that you saw perform-

ed by your students in Wisconsin, now. A. I just want to give you the list of places I have been and the places I have visited, and that is why it is a little difficult for me to recall all these things. I have been in Eau Claire, Wausau, Stevens Point, Marshfield, Racine, Kenosha,—

"Q. Who did you see operate in Marshfield, for instance? A. I can't recall his name.

"Q. Did you see Dr. Lawton in Marshfield, for instance? A. There is an old interne—a man that I interned with, who is a Pathologist in Marshfield—

"Q. Well, did you see Dr. Lawton operate in Marshfield? A. The name doesn't mean anything.

"Q. Well, now, have you remembered where you have seen your students operate on thyroids in Wisconsin? A. In the various cities that I mentioned.

"Q. In all of those cities? A. Oh, I couldn't say all of them, no.

"Q. Well, which ones? A. Kenosha, Racine, Marshfield, Wausau, Stevens Point, Eau Claire, Wisconsin Dells.

"Q. Who in Wisconsin Dells? A. I was never very good at remembering names.

"Q. And these were all thyroid operations? A. They were what?

"Q. These were all thyroid operations? A. At one time or another, yes.

"Q. Pardon? A. Yes.

"Q. You have seen thyroid operations performed by students of yours in all of these places? A. Not in all of them. In various of these places.

"Q. Well, I was interested in thyroid operations; that is what we are interested in. Now, which students have you seen—of yours—perform thyroid operations in Wisconsin? You said in the past year,

when I first asked you that question. A. Well, I tell you it is a little bit more difficult for me to recall the names, because I have had about 8,000 medical students—

"Q. All right. I am not interested in that—please. Can you remember how many thyroid operations you have seen performed by your students in Wisconsin? A. Oh, at least a half a dozen.

"Q. A half a dozen? A. Yes.

"Q. And over what period of time? A. A couple of years.

"Q. You can't give me the name of one of them? A. Well, the names slip me—

"Q. Pardon? A. They have slipped.

"Q. Doctor, how long is a medical student ordinarily in medical school? A. Four years.

"Q. And during that four years, how large a class do you have, each class in your school where you teach? A. Oh, they are various sizes. I have had—

"Q. About how large? A. Well, I have had it as low as two, and as large as 125.

"Q. And you have those students with you for a period of four years? A. Not me, no.

"Q. Well, you see them. They are in your— A. No, no.

"Q. How many times do you see them? A. Well, in the first two years, the first five quarters I wouldn't see them at all. I would see some of them in the sixth quarter, in their sophomore year. And then I would see some of them in their senior year, and that's all.

"Q. You don't have an opportunity to get very well acquainted with them? A. Some of them, yes.

"Q. What do you teach? A. What did I,—what do I teach?

"Q. What do you teach now? A. All the subjects?

"Q. Yes. A. All—O. K. I started teaching in 1932—

"Q. No, what do you teach now, please? A. Sir?

"Q. The question is: What do you teach now? You must have misunderstood me. A. Oh, I teach Physical Diagnosis, History of Medicine, Medicine, Physical Diagnosis in Surgery,—

"Q. Physical Diagnosis in Surgery? A. Yes—Differential Diagnosis, Bedside Medicine; various aspects of glandular diseases; the heart, the lungs, the kidneys; Admitting Patients; Pathology; Bacteriology—possibly a few others.

"Q. Do you teach surgery? A. The technique of surgery?

"Q. Yes. A. No. General surgery, as part of seeing a patient, yes.

"Q. Do you teach general surgery? A. As part of—

"Q. The technique? A. I didn't get that.

"Q. The technique of general surgery—do you teach that? A. If we see a thyroid patient we talk about it.

"Q. Oh, you didn't understand my question. Do you teach the technique—the procedure of general surgery? A. Yes, as part of the—of seeing the patient at the bedside.

"Q. Oh, as part of seeing the patient at the bedside. Not performing an operation, you don't teach that? A. Well, we discuss the technical aspects—

"Q. You do not teach the performing of an operation do you? A. I don't think we understand each other—

"The Court: That question is very simple. Listen to that question and then answer it. Read the question.

"(Pending question read by reporter, as follows:)

"You do not teach the performing of an operation, do you?"

"The Witness: A. The teaching of actual surgery is done on dogs, or is done on cadavers. That I do not teach.

"Mr. Beckwith: "Q. Do you do surgery now? A. No, I do not do surgery.

"Q. How long has it been since you have done any surgery? A. Major or minor?

"The Court: What is that?

"Mr. Beckwith: Q. Any surgery?

"The Witness: A. Any surgery—

"The Court: Major surgery?

"The Witness: What is it?

"Mr. Beckwith: Q. The Court asked you, major surgery?

"The Witness: Major surgery, sir?

"The Court: Yes.

"The Witness: It is 1948 since I stopped that.

"Mr. Beckwith: Q. 1948?

"The Witness: A. Yes.

"Q. And this is 195—well, the beginning of '60—eleven years.

"The Court: Would you consider a thyroid operation major surgery?

"The Witness: Yes.

"Mr. Beckwith: Q. Have you done any thyroid operations in the last eleven years?

"The Witness: A. No.

"Q. Now, before 1948 did you— what was your practice? A. General practice.

"Q. General practice? A. Yes.

"Q. Practicing alone? A. Do you mean by myself?

"Q. Yes. A. Yes.

"Q. In Chicago? A. Yes.

"Q. Were you teaching then? A. I have been teaching since 1932.

"Q. And you were teaching, then, too in 1948? A. Yes.

"Q. And in practice? A. Yes.

"Q. Are you in practice now? A. Oh, yes.

"Q. And teaching? A. Yes.

"Q. Now, how much of your time do you devote to practice? A. Are you talking about hours, days, or weeks?

"Q. Yes. How many hours of the day, or how many days of the week? We will get to it that way. A. I am a full-time practitioner.

"Q. You are a full-time practitioner? A. Yes.

"Q. In other words, you practice all the time? A. I don't know what you mean by all the time. Do you mean twenty-four hours a day?

"The Court: The same as any doctor does—the same as any doctor who is not attached to a university as a professor?

"The Witness: Oh, I am not attached—I am not a full-time attachment to a university.

"Mr. Beckwith: "Q. Oh, I misunderstood you.

"The Witness: A. No, no.

"Q. Put it this way: How much do you teach, out of a week's time? A. Oh, at the present time?

"Q. Yes. A. Oh, I teach approximately six hours a week.

"Q. Six hours a week? A. Yes.

"Q. And the rest of the time you are in private practice? A. Yes.

"Q. And your private practice consists of what we call internal medicine? Is that right? A. Yes.

"Q. In other words, it doesn't consist of surgery? A. It doesn't consist of the actual performance of major surgery.

"Q. Within the past—since 1948? A. Yes.

"Q. Now, before 1948, did you do major surgery? A. Yes.

"Q. Where? A. Columbus Hospital,—

"Q. For how long? A. Let's see—I was on the staff there for about fourteen years.

"Q. Pardon? A. Fourteen years.

"Q. So you did major surgery for fourteen years? A. I did whatever surgery came along, including major surgery.

"Q. Was that major surgery? A. Yes.

"Q. Was your practice confined to surgery? A. Oh, no. I said I was in general practice.

"Q. In general practice? A. Yes.

"Q. In other words, you took care of all of the patients who came to you, medical patients and surgical patients too? A. Well, it was necessary to make a living—

"Q. Answer my question, please. A. Yes, I said I was in general practice.

"Q. O. K. How much of your practice was medical practice and how much was surgical practice prior to 1948? A. Percentagewise?

"Q. Yes. A. Well, it is a little bit hard to describe it percentagewise,—

"Q. Well,— A. (Continuing)— oh, I would estimate it—this is purely an estimate, at 70–30, or 75–25.

"Q. Of what? Now, which is 75? A. The major portion is nonsurgical, and the minor portion is surgical.

"Q. In other words, you would have 75 per cent of medical work and 25 per cent of surgery, or 70 per cent of medical work and 30 per cent surgery. A. Yes.

"Q. In that neighborhood? A. Yes.

"Q. O. K. And over that period of time how many thyroid cases did you say you operated on? A. We were talking about the period from 1930 to 1948?

"Q. All right, over that period of time how many thyroid cases did you say you operated on? A. Several hundred.

"Q. Several hundred? A. Do you mean by myself, or with—are you talking about in connection with others?

"Q. Well, you have said—you were asked how many thyroid cases you operated on, and you said several hundred. Now I am asking you, is that correct? Did you operate in that period of time on that many thyroid cases? A. Yes.

"Q. You did? Alone? A. In conjunction with my attending man. Most of them were in conjunction with my—

"Q. Were you the surgeon or were you the assistant in those cases? A. In many—in most of the cases I was the surgeon.

"Q. In most of the cases? A. Yes.

"Q. You were the surgeon? A. Yes."

In opposition to Dr. Flaxman's testimony, the defendant submitted the testimony of six highly qualified surgeons, from this area, two of whom were general surgeons from the University of Wisconsin Hospital and who are on the teaching staff of the University, teaching surgery at the Medical School of the University. They all testified that it was good practice to perform the operation on plaintiff exactly as it was performed by Dr. Carter, and that the standard technique employed by Dr. Carter does not produce hypoparathyroidism.

Dr. Flaxman, who has not performed a thyroid operation since 1948, testified in effect that he would not have performed the operation in the manner defendant did.

**400**

In De Bruine v. Voskuil, 168 Wis. 104, 169 N.W. 288, 290, our Court said:

> "The entire case here rests upon the testimony of a physician to the effect that he would have treated the fracture in another way. Physicians are not compelled to choose at their peril between two accepted methods of treatment. Statements of experts that they would have treated the fracture in some other way are incompetent."

The hypothetical question submitted to Dr. Flaxman by plaintiff's counsel closed with this language: "Assuming all these facts I have given you, do you have an opinion as to whether the condition of permanent hypoparathyroidism is a result of the thyroid surgery we described."

Dr. Flaxman answered: "Yes, it could or might have been a result of the thyroid surgery performed under the conditions described in the hypothetical question."

His answer was speculative and conjectural and not competent and sufficient to establish the fact testified to to a reasonable medical certainty.

In Dr. Flaxman's opinion it is not good practice to perform a thyroid operation without visualizing two of the parathyroid glands. It was the testimony and opinion of six of the other surgeons that it is good practice and that it is the majority practice of the majority of surgeons, although it is recognized that some do attempt to visualize the parathyroid glands. The proof established the fact that Dr. Carter did everything that all of the six surgeons who testified would have done.

Dr. Carter in performing this operation, was bound to bring to his aid and relief such care and skill as is ordinarily possessed and used by surgeons of the same system or school of practice in the vicinity or locality in which he resides, having reference to the advanced state of medical and surgical science at the time.

He did use the accepted and the same technique as is ordinarily used by surgeons in his vicinity and this standard has been firmly established by the testimony of six of the recognized leading surgeons in this locality as proper.

The testimony established the fact that tetany does in some instances follow operations that are properly performed. The defendant properly performed this operation, according to the testimony of the six reputable surgeons of this locality of long experience in this field of operations, and yet tetany and hypoparathyroidism developed.

Dr. Flaxman lacked the qualifications of an expert, and the Court finds that the record is barren of any competent proof that the defendant was negligent as alleged in the complaint. The evidence wholly fails to disclose any negligence on the part of Dr. Carter in performing this operation.

Defendant's motion that the complaint be dismissed is granted, without costs.