ARLISS L. MILLER AND ANOTHER v. OLAF J. RAAEN.

139 N. W. (2d) 877.

January 28, 1966—No. 39,480.

*Robins, Davis & Lyons, Arnold Bellis,* and *Stanley E. Karon,* for appellants.

*Altman, Geraghty & Mulally, J. H. Geraghty,* and *James M. Corum,* for respondent.

KNUTSON, CHIEF JUSTICE.

This is an appeal from an order of the trial court denying plaintiff's motion for judgment notwithstanding the verdict or in the alternative for a new trial, following a verdict directed by the court at the close of plaintiff's case.

The case involves a suit for malpractice against a medical doctor specializing in anesthesiology. Defendant received his medical training at the University of Oslo, Norway, and practiced medicine in that country until 1950. Arriving in the United States in 1950, he interned in a hospital in North Dakota, where he remained until May 1952. He then started a residency in anesthesiology at the University of Minnesota. In 1955 he

took the state medical board examinations and was licensed to practice medicine in this state. Thereafter he limited his practice to anesthesiology. He was associated with a group called Anesthesia Associates, who practiced for the most part in hospitals in Minneapolis. Later he moved to St. Paul and became a member of a group called Associated Anesthesiologists. At the time of the occurrence leading to this litigation he practiced primarily in Miller Hospital, but from time to time would handle cases in other St. Paul hospitals. An anesthesiologist is distinguished from an anesthetist in that he is a licensed doctor of medicine, whereas the anesthetist is not.

Plaintiff Arliss Miller entered Miller Hospital on August 31, 1959, for minor surgery. Dr. Norbert John Lilleberg, a specialist in obstetrics and gynecology, who was Mrs. Miller's employer, was the operating surgeon. Mrs. Miller chose to have an anesthesiologist rather than a nurse anesthetist administer the anesthetic, and defendant was the doctor who was to perform that phase of the operation.

Prior to the administration of the anesthetic defendant had visited Mrs. Miller in her hospital room in order to discuss her past medical history so that the type of anesthetic to be used could be determined. It was then decided to use sodium pentothal. On the morning of September 1 Mrs. Miller was given some drugs in preparation for the operation to be performed that day. At about 1:30 p. m. she was taken to the operating room and placed on an operating table, lying on her back with her left arm outstretched on an arm board. The defendant applied a tourniquet to make the vein selected for the injection stand out. He then inserted the needle through which the anesthetic was to be injected. He drew some blood from the vein to indicate that the needle was properly placed, removed the tourniquet, reinjected the blood, for a further indication that the needle was in the vein, and then connected a length of tubing to the needle to enable a syringe to be connected so that he might remain at a point near the patient's head while injecting the anesthetic. He then injected a dosage of 3 to 4 cubic centimeters of sodium pentothal as a test dose, and secured the needle to her arm and the arm board by adhesive tape. He then went to the head of the table and from that position made at least one more injection through the tubing. He then noticed that Mrs.

Miller was not going down to the desired depth of anesthesia as fast as expected and looked at her hand to see if the needle was properly placed, but saw no sign of infiltration or leakage at that time. He administered more sodium pentothal. At that time the patient informed defendant that it was strange she was not going to sleep and defendant went to the side of the table and removed the needle from her hand. It could be found from the evidence that 5 to 8 minutes had elapsed since injection of the anesthetic was begun. He then noticed there had been an infiltration of sodium pentothal into the tissue of her hand. He inserted the needle farther up on her arm, anesthesia followed, and the operation was successfully completed. During the surgery, defendant injected a drug called Aladase in the area of the original leakage in order to lessen the possibility of damage to the tissues from the sodium pentothal solution. At the bottom of the hospital anesthetic record, the defendant made the notation:

"On induction accidentally an intravenous extravasation of P C occurred on the back of the left hand, possible 8-10 cc. 10 cc Saline with Aladase 150 units infiltrated in the area."

During the operation a total of 34 cubic centimeters of sodium pentothal was used.

After regaining consciousness in the recovery room, Mrs. Miller noticed pain in her left hand and observed that it was wrapped in towels and a hot pack. After removal of the towels and hot pack, Mrs. Miller noticed her hand was very swollen and discolored and that she could not manipulate it. Defendant told her he was sorry about the accident and recommended heat and massage treatment for the hand. When there appeared to be little progress, defendant referred Mrs. Miller to an orthopedist who, in turn, referred her to another. The treatment suggested by the orthopedists, after they had examined the hand, was the same as originally recommended—heat, massage, and exercise. At the time of the trial in 1963 the condition of the hand had not improved noticeably. There was still pain and it was still swollen and discolored. The injury has caused Mrs. Miller difficulty in her work as a secretary, in doing her housework, and in her social life, in that she has little strength in her left hand and cannot hold objects in it.

This action was commenced by Mrs. Miller and her husband to recover damages for the alleged negligence of the defendant in administering the anesthetic. At the close of plaintiff's case, the trial court directed a verdict in favor of defendant on the grounds that there was no medical testimony establishing that what defendant did was contrary to the usual medical practice.

The only issue is whether the court was correct in directing a verdict in favor of defendant.

■ While malpractice cases have developed as a rather unique area of negligence law, liability still rests upon proof of negligence on the part of the doctor. The basic elements in establishing negligence as stated by Professor Prosser are:

"* * * The traditional formula for the elements necessary to such a cause of action may be stated briefly as follows:

"1. A duty, or obligation, recognized by the law, requiring the actor to conform to a certain standard of conduct, for the protection of others against unreasonable risks.

"2. A failure on his part to conform to the standard required. * * *

"3. A reasonably close causal connection between the conduct and the resulting injury. * * *

"4. Actual loss or damage resulting to the interests of another." Prosser, Torts (3 ed.) § 30.

In a malpractice case, while the basic test is still conduct of a reasonably prudent man, the learning and experience of a doctor must be incorporated into that definition, and "[t]he formula under which this usually is put to the jury is that he must have the skill and learning commonly possessed by members of the profession in good standing; and he will be liable if harm results because he does not have them." Prosser, Torts (3 ed.) § 32, p. 165. We find an expression of that rule in many of our cases. See, Viita v. Fleming, 132 Minn. 128, 155 N. W. 1077, L. R. A. 1916D, 644; Quickstad v. Tavenner, 196 Minn. 125, 264 N. W. 436. See, also, Louisell & Williams, Trial of Medical Malpractice Cases, § 8.04.

■ In the ordinary case the standard applied involves scientific knowledge that must be defined by expert medical witnesses. Harju v. Allen, 146

Minn. 23, 177 N. W. 1015; Martin v. Courtney, 75 Minn. 255, 77 N. W. 813; Yates v. Gamble, 198 Minn. 7, 268 N. W. 670.

■ There are exceptions to this rule where liability may be established without expert testimony. In the Harju case we said (146 Minn. 26, 177 N. W. 1016):

"* * * There are some facts pertinent to a case in malpractice which may be proven only by the testimony of experts. For example a nonprofessional observer may not ordinarily diagnose disease [citation omitted]; the standards of practice in different schools of medicine must be established by the testimony of experts of those schools [citation omitted]; and generally with respect to matters of science or specialized art [citation omitted], or with respect to matters resting upon pure theory, judgment, and opinion, based upon reasons familiar only to experts, the opinion of experts is generally the only evidence receivable. [Citation omitted.] But it is not the law that a physician can never be found guilty of malpractice except on opinion evidence of negligence furnished by other practitioners. As said in Getchell v. Hill, 21 Minn. 464: 'There may be cases where, the mode of treatment having been shown, the practical common sense of the jury will enable them to determine that the injury or failure of cure is due to unskilful or negligent treatment.' "

Thus it has been held that recovery without expert testimony may be permitted, as where metal clips were left in the body after surgery, Fowler v. Scheldrup, 166 Minn. 164, 207 N. W. 177; where there was a failure to remove a sponge after surgery, Baer v. Chowning, 135 Minn. 453, 161 N. W. 144, and Walker v. Holbrook, 130 Minn. 106, 153 N. W. 305; where a dentist permitted a grinding disc to slip and cut membranes and tissues at the base of the tongue, Ellering v. Gross, 189 Minn. 68, 248 N. W. 330; where a dentist continued to administer gas as an anesthetic after cyanosis appeared, Harris v. Wood, 214 Minn. 492, 8 N. W. (2d) 818; where ether was administered as an anesthetic after cyanosis appeared as a danger signal, Moehlenbrock v. Parke, Davis & Co. 145 Minn. 100, 176 N. W. 169; where X-ray burn resulted from the improper administration of X ray, Holt v. Ten Broeck, 134 Minn. 458, 159 N. W. 1073, and Jones v. Tri-State T. & T. Co. 118 Minn. 217, 136 N. W. 741,

40 L. R. A. (N.S.) 485; and where a chemical burn from phenol resulted from the improper application of the chemical, Jensen v. Linner, 260 Minn. 22, 108 N. W. (2d) 705.

All of these cases involved situations where there was no doubt about the cause of the result complained of, and the result would not have followed in the absence of a breach of duty, the establishment of which did not involve any scientific knowledge. In some of the cases the failure of defendant to comply with the required standard of conduct was established by the defendant himself or by other expert witnesses. See, for instance, Harris v. Wood, *supra,* and Moehlenbrock v. Parke, Davis & Co. *supra,* where cyanosis as a danger signal was established by the defendant himself. Where the standards are established and the only question involved was whether there was a breach of these standards, res ipsa loquitur has been held to be available to establish such breach. Jensen v. Linner, *supra;* Holt v. Ten Broeck, *supra;* Jones v. Tri-State T. & T. Co. *supra.*

■ The question in this case is whether its facts fall within any of these exceptions. It is the claim of plaintiff that they do, because, as stated in her brief:

"* * * [P]laintiff does not contend that defendant followed the wrong procedure or chose the wrong anesthetic. Plaintiff does contend that defendant was careless and inattentive in the manner in which the injection was made and that defendant was inattentive to his patient while administering the anesthetic."

In other words, plaintiff's case rests on the contention that defendant doctor should have acted sooner after discovering that the method adopted by him was malfunctioning. The difficulty with plaintiff's position is that the record is devoid of any evidence that would establish that defendant had such warning in time to take action to avert the harm done. Dr. Lilleberg, who was the only medical expert called by plaintiff, testified, when asked what the causes of infiltration are:

"Well, at times the veins collapse. The vein will go into spasm and collapse from having a foreign body in it. A needle will slip out of a vein obviously or a leak will occur around the side of the perforation, the venal puncture."

When asked for his opinion as to the cause of the infiltration in this case, he said:

"I don't know. I only came in and saw that the hand was swollen after this happened."

He testified that he never uses the veins of the hand to make injections for drugs or medications and that while he has used sodium pentothal as an anesthetic for minor surgery, he normally has an anesthesiologist or anesthetist administer the anesthetic.

That was all the medical evidence there was.

In Simon v. Larson, 210 Minn. 317, 298 N. W. 33, much the same claims were made as are made here. In our opinion we said (210 Minn. 319, 298 N. W. 34):

"* * * Plaintiff does not claim, as in many malpractice cases, that defendant lacked requisite skill or that there was a departure from recognized practice in treatment. Her claim is that in using a recognized technique defendant failed to use ordinary care, with the result that the solution which should have been confined to the interior of the vein was carelessly spilled in the vicinity of the incision, causing sloughing. This theory of liability, it is said, does not require medical testimony to fortify its existence."

In holding that the evidence in the case did not present a jury question, we said (210 Minn. 320, 298 N. W. 34):

"* * * Plaintiff in no respect, circumstantially or otherwise, established what quantity was likely to produce sloughing nor that such quantity had been used here. Without that proof, reasoning from the fact of sloughing to the fact of improper spillage would be wholly conjectural."

Plaintiff relies heavily on Moehlenbrock v. Parke, Davis & Co. 145 Minn. 100, 103, 176 N. W. 169, 170, where we said:

"* * * From the testimony of the defendant surgeons, and from common knowledge of physical facts and laws, the jury might infer that, if appellants had desisted from the use of the ether at the first sign of danger, decedent's life might have been spared, and that reasonable prudence required them to do so.

"It is only in cases where the evidence and the facts to be deduced therefrom, are undisputed, and the case concerns a matter of science or specialized art, or other matters of which a layman can have no knowledge, that the opinion of experts is conclusive. * * * This is not such a case."

In the Moehlenbrock case, however, it was shown that the ether used was unsatisfactory for use. There was medical testimony that if a patient is on a table having ether administered and develops a cyanotic condition, and if that cyanotic condition proceeds and increases as the ether is administered, it is dangerous to continue it. It was established that such condition did exist. It appeared by medical testimony that when the cyanotic condition appears it is a warning signal to a physician that if the ether is persisted in, it is dangerous, and if persisted in too much, it will cause death of the patient.

With the establishment of those facts we held that expert testimony as to the conduct owed by the doctor was not necessary. However, the case is to be distinguished from the one before us in that here there is no medical evidence that the defendant had a warning in time to avert the damage to plaintiff's hand.

■ We have reviewed the cases from foreign jurisdictions cited by the parties but see no need to discuss them here. It is true that cases may be found elsewhere that seemingly support plaintiff's position. Most of the cases deal with proof of breach of established duty rather than what the standard itself is. We are convinced that our own law is sufficient to determine the issues involved and that we need not resort to foreign decisions which in this field of law are impossible to reconcile.

Concededly, malpractice cases are difficult to prove, due, at least in part, to the reluctance of one doctor to testify against another. This difficulty has led some courts to accept and apply the doctrine of res ipsa loquitur where it would probably normally be rejected.[1] The cases are in hopeless conflict with respect to the application of the doctrine and the

---

[1] See, Louisell & Williams, Trial of Medical Malpractice Cases, § 14.01. For a discussion criticizing the application of the doctrine, see Adamson, *Medical Malpractice: Misuse of Res Ipsa Loquitur*, 46 Minn. L. Rev. 1043.

necessity for expert testimony to establish the essentials of the cause of action. The whole subject has been exhaustively annotated,[2] but even in the cases where the doctrine of res ipsa loquitur has been applied the courts adhere to the first requirement of the doctrine—that the case must be one where the result does not normally occur unless someone is guilty of negligence.[3]

In this case plaintiff's own witness has established, without any contradiction, that infiltration of the anesthetic can and does occur even though no one is negligent. Plaintiff does not claim otherwise in her appeal, but rests her right to recover on the contention that defendant should have acted sooner after having been warned that infiltration was occurring. It is here that plaintiff's proof falls short. The evidence shows that individuals have different tolerances to sodium pentothal, and that it takes more anesthetic to reach the desired depth of anesthesia in some individuals than in others. Whether defendant should have noticed that something was wrong sooner than he did and taken corrective action as a result is a matter beyond the common knowledge of laymen. It is not similar to the cases where a sponge or clip is left in the human body, or a burn occurs in a manner that could not have happened in the absence of negligence. The minimum requirement here should be that plaintiff establish by expert testimony what signals should have warned defendant and what he should have done sooner than he did to avert the damage to plaintiff's hand. To permit a jury to infer these essentials to recovery would be to base liability entirely upon conjecture and speculation in an area where laymen are unfamiliar with the facts.

■    Res ipsa loquitur may not be applied where the injury could be the result of one of several causes, some of which are not chargeable to defendant. Yates v. Gamble, 198 Minn. 7, 268 N. W. 670; Heffter v.

---

[2] See Annotation, 141 A. L. R. 5, on the necessity of expert evidence to support an action for malpractice against a physician or surgeon; Annotation, 162 A. L. R. 1265, titled, "Physicians and surgeons: presumption or inference of negligence in malpractice cases; res ipsa loquitur"; Annotation, 53 A. L. R. (2d) 142, on the duty and liability of an anesthetist in malpractice cases.

[3] See, Louisell & Williams, Trial of Medical Malpractice Cases, § 14.04, p. 425; Prosser, Torts (3 ed.) § 39, p. 218.

Northern States Power Co. 173 Minn. 215, 217 N. W. 102; Wallstedt v. Swedish Hospital, 220 Minn. 274, 19 N. W. (2d) 426, where we held the doctrine did not apply in a case involving a burn alleged to have been caused by a hot-water bottle. We there distinguished Ybarra v. Spangard, 25 Cal. (2d) 486, 154 P. (2d) 687, 162 A. L. R. 1258. See, also, Collings v. Northwestern Hospital, 202 Minn. 139, 143, 277 N. W. 910, 912, where we said:

"* * * That doctrine [res ipsa loquitur] permits the inference of a fact from an occurrence when there is no other probable cause of the occurrence * * *.

"* * * An inference of negligence based on an inferred fact of which there is neither evidence nor predominating probability cannot be safely made."

The ordinary rule of malpractice cases that expert testimony is generally required to establish negligence is applicable to cases involving the administration of anesthetics.[4] In Johnson v. Arndt, 186 Minn. 253, 243 N. W. 67, defendant's patient died as the result of the administration of an anesthetic in the process of removing her tonsils. The negligence claimed by plaintiff was that defendant negligently injected into the throat of the decedent an excessive and destructive quantity of a drug used as an anesthetic. In holding that res ipsa loquitur did not apply, we said (186 Minn. 257, 243 N. W. 69):

"Plaintiff urges that the rule of res ipsa loquitur should apply. The cases above cited sufficiently show that the rule does not apply to a malpractice case of this kind. We have cases involving the negligence of physicians and surgeons where the rule has been applied to a limited extent. But in each of these cases there was direct evidence as to the cause of the injury."

With respect to the requirement for expert testimony, we said (186 Minn. 258, 243 N. W. 69):

"* * * The jury is asked to be permitted to infer that defendant did something which he is not shown to have done, and then to base on that

---

[4] See, Annotation, 53 A. L. R. (2d) 142, 146.

inference the further inference that what he is so inferred to have done caused decedent to die. Inferences may not safely be carried that far. Had there been evidence to show that defendant used an excessive amount of anaesthetic or other dangerous poison, the jury could well have found that he was negligent and have further inferred and found that his negligence caused the death. But the foundation for the finding of negligence is here wanting.

"We do not hold that it is necessary for plaintiff to have expert testimony to sustain his claim of negligence in a malpractice case if there is other evidence sufficient to prove negligence and causal connection between such negligence and the injury complained of. In many cases, however, the situation may be such that expert testimony is necessary."

Based on the above we reversed the trial court and held the evidence was insufficient to permit recovery.

We are mindful of the fact that plaintiff contends this is not the issue in the case; that she does not deny that infiltration may occur in the absence of any negligence on the part of the person administering the anesthetic, but claims only that a fact issue exists as to whether defendant was negligent in not taking prompt action after being warned that the anesthetic was not taking effect. However, the facts relating to the cause of the infiltration are so inextricably related to the warning defendant had, upon which plaintiff contends he should have acted, that we cannot ignore them. What defendant should have discovered, and when; and what action he should then have taken and how effective it would then have been to avert the damage to the tissues of plaintiff's hand are matters requiring expert evidence. In the absence thereof the trial court could do nothing but direct a verdict for defendant.

Affirmed.