RICHARD WILLIAM SWANSON, A MINOR, BY
MELVIN SWANSON, HIS FATHER AND NATURAL
GUARDIAN, AND ANOTHER v. DR. CARL C.
CHATTERTON AND OTHERS.

160 N. W. (2d) 662.

August 2, 1968—No. 40,757.

130

*Thomas F. Burns,* for appellants.

*Charles R. Murnane* and *Murnane, Murnane, Battis & deLambert,* for respondent Dr. Chatterton.

*B. C. Hart, Jonathan H. Morgan, Samuel L. Hanson,* and *Briggs & Morgan,* for respondent Dr. Loken.

*J. H. Geraghty* and *Altman, Geraghty, Leonard & Mulally,* for respondent hospital.

PETERSON, JUSTICE.

Plaintiff, a minor, by his father and natural guardian, sued three defendants for medical malpractice: Dr. Carl C. Chatterton, an orthopedic surgeon; Dr. Samuel M. Loken, a physician in general practice; and the Board of Social Ministry of Minnesota Synod of the Lutheran Church in America, owner and operator of Bethesda Lutheran Hospital, St. Paul (hereinafter "Bethesda"). The claim of malpractice arises out of the operative and postoperative treatment of the injured minor who, subsequent to the reduction of a supracondylar fracture of his arm, suffered a serious deformity as the result of a Volkmann's ischemic contracture and paralysis.

The trial court directed verdicts for each of the defendants, and plaintiff appeals from the order denying his subsequent motion for a new trial.

We hold, for the reasons stated in this opinion, that the verdict was properly directed for defendant Chatterton; and we hold, without other discussion, that the verdicts were properly directed for defendants Loken and Bethesda. Dr. Chatterton, therefore, will be alone referred to as defendant, and the injured child will, for convenience, be referred to as plaintiff.

The basic issue arises out of the trial court's exclusion of certain testimony of plaintiff's medical witness on the ground that the witness was not qualified as an expert to give answers to those questions essential to a finding that defendant was professionally negligent. It is the basic issue because, as we hold, the jury could not have rendered a finding of negligence without the assistance of qualified medical testimony. The verdict was properly directed against plaintiff, therefore, unless we could hold that the trial court abused its discretion in excluding the crucial testimony of the medical expert proffered by plaintiff.

It is not disputed that plaintiff suffered a Volkmann's ischemic contracture and paralysis (hereinafter referred to as a Volkmann's contracture) sometime subsequent to his treatment by defendant for a supracondylar fracture of the right arm. The method of reducing this common fracture of children and the nature of a Volkmann's contracture as a hazard inherent in its treatment are not, in general terms, disputed either. The fracture was, in this case, typically reduced by flexing the elbow under strong traction to approximately a right angle, after which the arm was immobilized by a splint and bandage.

A Volkmann's contracture is the result of a serious interference with the blood supply to the arm. An occlusion of blood circulation causes the tissues to die, resulting in displacement of muscle tissue by noncontractile fibrous tissue, with a consequent contraction of the muscles, and hence a deformity. The arterial circulation to the arm passes through a small antecubital space in the elbow and may become constricted or occluded as a result of trauma. A serious interference with the blood supply may have serious consequences within as short a time as one hour. The signs and symptoms of a developing Volkmann's contracture and paralysis usually include pallor, cyanosis in the affected area, swelling, lack of sensation and inability to move the fingers, and pain.

Plaintiff, then a 5-year-old child, suffered the supracondylar fracture of his arm on June 20, 1951. This action was not commenced, however, until March 14, 1963, almost 12 years later, when records and recollections were somewhat diminished. On the date of his injury, plaintiff's parents immediately called Dr. Samuel M. Loken, who, after taking X rays of plaintiff's arm at Bethesda the same afternoon, diagnosed the severity of the fracture. Dr. Loken advised plaintiff's parents that he was not fully competent to treat the fracture and recommended to them the special competence of Dr. Chatterton. Defendant, with Dr. Loken assisting, reduced the fracture and applied a splint that same evening in the hospital's operating room. Plaintiff was discharged from the hospital the next day upon the order of defendant, and neither Dr. Loken nor Bethesda had any relationship with plaintiff's treatment thereafter.

The onset of the Volkmann's contracture is not certain. On the morning plaintiff was discharged from the hospital, defendant examined plaintiff as to the critical indications of blood circulation in the arm and was "very happy about it all the way through." At that time, defendant testified, he instructed plaintiff's mother that it was essential that her son be seen by a doctor—either himself or Dr. Loken—the next day. He did not specifically instruct her as to the signs and symptoms of a Volkmann's contracture because, according to his testimony, only a person with medical training could recognize the medical significance of such conditions. He testified from his office records that plaintiff was not brought to him, however, until June 29, eight days later. This is disputed by plaintiff, whose mother testified that defendant, without other instructions, told her only to bring plaintiff to his office on Saturday, two days later; that she nevertheless took plaintiff to defendant's office the next day, Friday, because she observed that her son was in pain and that his fingers were swollen and "possibly bluish"; that after waiting for almost four hours in defendant's reception room she observed that the pain had apparently subsided and decided to return instead at the appointed hour the next morning. She testified that, upon noting plaintiff's condition on that Saturday, defendant exclaimed: "I don't know what went wrong. If I had it to do over again, I'd do it the same way." But for the dispute as to the day of this observation, that could well have been defendant's concerned reaction; for although the possibil-

ity of this postfracture condition has been theoretically known for about a hundred years, it is nevertheless a relatively rare occurrence.

Defendant, whose eminence as an orthopedic surgeon is not challenged,[1] was unable to definitely diagnose the existence of a Volkmann's contracture or its cause until about July 13 or even July 27. He had, in several prior examinations of plaintiff, observed that plaintiff was in pain, that there was some pallor, and that there was marked swelling and paralysis; but he observed no sloughing of flesh and thought there had been evidence of improvement, based upon his own observations and the conditions reported to him by plaintiff's mother. He ultimately concluded that a Volkmann's contracture existed and that there had been a traumatic swelling of the muscle itself which caused a change in the muscle structure.

■ The crucial issue of fact is whether defendant failed to measure up to the standards of care, skill, and practice of orthopedic surgeons in this area in 1951, the year in which the alleged malpractice occurred. More specifically, as articulated in plaintiff's amended complaint and offer of proof, the question is whether defendant imposed too tight a cast[2] upon

---

[1] Defendant was graduated from Northwestern University Medical School in 1910, and in 1912 he was licensed to practice medicine in Minnesota. After an internship at the City and County Hospital, he became associated in private medical practice with Dr. Arthur Gillette, a well-known orthopedic specialist. In addition to membership in the state, county, and local medical societies, defendant is a member of the American College of Surgeons and the American Academy of Orthopedic Surgeons. At the time he treated plaintiff he had had extensive experience in the treatment of supracondylar fractures, and, although he had never experienced a Volkmann's contracture in his patients, he had for many years studied about this condition. He was on the medical staff of eight hospitals and was chief of staff of Gillette State Hospital, St. Paul, a specialized institution for the treatment and rehabilitation of crippled children.

[2] There is some dispute as to the nature of the splint used. Defendant, with confirmation of the hospital records, testified that it was a posterior slab splint. Plaintiff's mother testified, on the contrary, that it was a full cylinder cast. Plaintiff's offer of proof as to the opinion of his medical expert stated that the opinion would be no different regardless of whether the cast was one or the other. The factual dispute as to the specific kind of cast or splint used, therefore, would not affect the propriety of the directed verdict.

plaintiff's arm at the outset or maintained it in too tight a condition during the period between its application and the establishment of the Volkmann's contracture; failed to recognize signs and symptoms of the impending or established Volkmann's contracture prior to his ultimate diagnosis of it; failed to give adequate instructions to plaintiff's parents under the circumstances; and failed to take appropriate measures either to prevent or arrest and reduce the severity of the Volkmann's contracture once its onset was observed. Plaintiff's medical expert presumably would have answered, in response to hypothetical questions, that defendant was negligent in one or more of these particulars and had not measured up to the recognized medical standards in this area.

It is well settled that the standard of care to be applied in a medical malpractice action is the standard of skill and learning ordinarily possessed and exercised under similar circumstances by physicians in good standing in the same or similar localities.[3] Plaintiff must not only offer competent evidence to establish the recognized standard of the medical community, but he must also offer evidence to show that the physician in fact departed from that standard in his care or treatment of the patient.[4] Because comprehension of the relevant medical standard requires scientific knowledge, a jury of laymen is incompetent to make a finding without the assistance of testimony from expert witnesses qualified to state such standard. And, with exceptions not here applicable, it requires a qualified medical expert to testify that the care and treatment did not measure up to that medical standard.[5] The trial court, in excluding the testimony of the medical wit-

---

[3] Fritz v. Parke Davis & Co. 277 Minn. 210, 152 N. W. (2d) 129; Hoffman v. Naslund, 274 Minn. 521, 144 N. W. (2d) 580; Schulz v. Feigal, 273 Minn. 470, 142 N. W. (2d) 84; Miller v. Raaen, 273 Minn. 109, 139 N. W. (2d) 877; Manion v. Tweedy, 257 Minn. 59, 100 N. W. (2d) 124; Yates v. Gamble, 198 Minn. 7, 268 N. W. 670. See, also, Prosser, Torts (3 ed.) § 32, p. 165.

[4] See, Davis v. Virginian Ry. Co. 361 U. S. 354, 80 S. Ct. 387, 4 L. ed. (2d) 366.

[5] Even if a jury were to credit the testimony of plaintiff's mother that plaintiff was not promptly admitted to see defendant when plaintiff was taken to defendant's office on the Friday after his discharge from the hospital or her testimony that defendant did see plaintiff on the next day, Saturday,

ness proffered by plaintiff, ruled that there was no adequate foundation for the testimony and that the medical expert was not qualified to answer the determinative questions. We must, therefore, consider the professional credentials of the proffered expert.

■ The medical expert presented by plaintiff was Dr. Abraham Falk, who during the period from 1957 to 1962 was medical director of the Group Health Plan in St. Paul and is now chief of the medical staff of the Veterans Administration Hospital in Minneapolis. Despite these not unimpressive credentials, however, Dr. Falk's qualifications to give the particular expert testimony demanded in this case require more searching appraisal. Dr. Falk is an accredited specialist in internal medicine, but not in orthopedic surgery. He was graduated from Albany Medical College, New York, and, after serving an internship and a residency in internal medicine at Albany Hospital, he came to Minnesota as an employee of the Veterans Administration Hospital in 1944. He was not licensed or authorized to practice medicine at any place in Minnesota other than the Veterans Administration Hospital until 1957. Prior to that time, he never engaged in the private practice of medicine anywhere, either by himself or in association with others. He had never in any way participated in the reduction of any supracondylar fracture. As Dr. Falk had acknowledged in a deposition, he neither knew of any outstanding

---

at which time defendant allegedly exclaimed that he "[did not] know what went wrong," we do not think that alone would create a jury issue without expert medical testimony. Plaintiff himself apparently did not so consider it until his argument on appeal. It would still be a matter of qualified medical judgment as to whether there were at that time manifest signs and symptoms of a Volkmann's contracture and, if so, whether it might have been prevented or arrested by recognition of the condition at that time. Of course, if plaintiff did in fact see defendant within two days after discharge, rather than eight days later, the question of the adequacy of defendant's original instructions seemingly would be of less significance. In all of the cases where we have held that a recovery may be permitted without expert testimony, as summarized in Miller v. Raaen, 273 Minn. 109, 115, 139 N. W. (2d) 877, 880, "there was no doubt about the cause of the result complained of, and the result would not have followed in the absence of a breach of duty, the establishment of which did not involve any scientific knowledge."

authorities nor could name any learned articles or orthopedic books that he had read on the treatment of supracondylar fractures or the prevention of Volkmann's contracture. Although his credentials in the specialty of internal medicine and the subspecialty of pulmonary diseases are unquestioned, the fact remains that but for minor surgery and some work in skeletal tuberculosis he has had no substantial experience or expertise in the direct care of orthopedic patients. His knowledge of this subject was mainly based upon the teaching he absorbed in medical school from which he was graduated 15 years prior to the year to which his testimony would relate.

Dr. Falk's status as chief of the medical staff of the Veterans Hospital [6] or as medical director of the Group Health Plan is, of course, one of distinction and authority. However, the functions of the chief of staff in the Veterans Administration Hospital—such as responsibility for selection of the regular and consulting staff of doctors, including orthopedic surgeons and other specialists, and responsibility for the general quality of the medical care administered—are primarily executive and administrative in character. So also, as medical director of the Group Health Plan, he apparently selected the staff doctors, except that orthopedic cases were referred under his supervision to consulting specialists, and he had the responsibility for the general quality of the medical care afforded by the medical staff. These responsibilities, by their very importance, would tend to preclude any extensive direct care and treatment of patients and, in any event, do not attest Dr. Falk's qualifications to state the standards existing prior to his assumption of these responsibilities.

The sufficiency of the foundation to qualify a witness as an expert, as we most recently stated in Teslow v. Minneapolis-Honeywell Regulator Co. 273 Minn. 309, 312, 141 N. W. (2d) 507, 509,[7] is primarily a

---

[6] Prior to his becoming chief of staff in 1950, Dr. Falk's career in the Veterans Administration included service as a medical officer in the outpatient clinic and admitting ward, residency in internal medicine, and service as an assistant chief of the tubercular service. The Veterans Administration Hospital is a "teaching hospital," affiliated with the University of Minnesota Medical School, and he is, in that connection, an assistant professor of medicine.

[7] See, also, Smith v. Twin City Motor Bus Co. 228 Minn. 14, 36 N. W.

question for the determination of the trial court, which we will reverse only if it is clearly wrong. In this case the trial court made clear that it was not excluding the testimony merely because the witness was not a specialist in orthopedic surgery. It concluded only that he had not established his qualification to render an opinion in this particular field by a sufficient showing that he had had the opportunity and the means of acquiring the special knowledge or experience essential to giving authoritative answers to the particular questions posed. We cannot on this record hold that the exclusion of Dr. Falk's testimony was clearly wrong and, therefore, an abuse of discretion.

We think, indeed, that there is persuasive precedent from other jurisdictions supporting the trial court's ruling. In Pearce v. Linde, 113 Cal. App. (2d) 627, 248 P. (2d) 506, where the issue was whether a surgeon had used proper care and skill in performing a foot operation, the trial court excluded the proposed testimony of a physician who was a specialist in internal medicine but had no experience in orthopedic surgery. The court, affirming that ruling, said in part (113 Cal. App. [2d] 629, 248 P. [2d] 507):

"* * * This doctor was licensed to practice medicine in both California and Nevada. Since 1931 he had practiced in Reno, Nevada, and had no practice in California. He was a specialist in internal medicine. He had had no experience in orthopedics or in any other branch of surgery. Patients coming to him requiring treatment in orthopedic surgery were all referred by him to an expert in that branch of the practice. He testified that he had some knowledge of what was the proper professional treatment of such cases from what he had read or from what he had heard from experts in that line. Since the question involved was whether the defendants had used proper skill and care in performing the several operations on plaintiff's foot, the testimony of an expert in internal medicine

(2d) 22; Woyak v. Konieske, 237 Minn. 213, 54 N. W. (2d) 649, 33 A. L. R. (2d) 1241; Lovejoy v. Minneapolis-Moline Power Imp. Co. 248 Minn. 319, 79 N. W. (2d) 688; Roeder v. North American Life Ins. Co. 259 Minn. 168, 106 N. W. (2d) 624.

would be no more persuasive than that of a layman who had read and heard what was the proper professional practice.

\* \* \* \* \*

" 'The definitive criteria in guidance of the trial court's determination of the qualifications of an expert witness are recognized in *Sinz v. Owens, supra,* 33 Cal. 2d 749, to rest primarily on "occupational experience," as stated at page 753: "The proof of that standard (the reasonable degree of skill, knowledge, and care ordinarily possessed and exercised by members of the medical profession under similar circumstances) is made by the testimony of a physician qualified to speak as an expert and having in addition, what Wigmore has classified as 'occupational experience—the kind which is obtained casually and incidentally, yet steadily and adequately, in the course of some occupation or livelihood.' (2 Wigmore on Evidence [3d ed.] Sec. 556, p. 635.) He must have had basic education and professional training as a general foundation for his testimony, but it is a practical knowledge of what is usually and customarily done by physicians under circumstances similar to those which confronted the defendant charged with malpractice that is of controlling importance in determining competency of the expert to testify to the degree of care against which the treatment given is to be measured." ' " [8]

In Peterson v. Carter (W. D. Wis.) 182 F. Supp. 393, the court, in ruling that one doctor was not qualified to give expert testimony as to another doctor's negligence in the removal of plaintiff's parathyroid glands, said in part (182 F. Supp. 395):

"Dr. Flaxman has practiced in Chicago, Illinois, since he finished his internship in 1933. He never had a residency in surgery. He does not hold himself out as a surgeon. Practically all of his practice has been as a physician. He performed no major operations since 1948. Before that time he did some surgery but his practice was divided about 70% to 75%

---

[8] Similarly, in Moore v. Belt, 34 Cal. (2d) 525, 212 P. (2d) 509, where the issue involved the existing standards in the practice of urology, the affirmed ruling of the trial court excluded the testimony of a physician who had practiced as an autopsy surgeon for 29 years but had not practiced urology and did not know the methods of practice therein.

medical practice, and 25% to 30% surgery. He has never qualified for any of the surgical societies or organizations. He is certified by the American Board of Internal Medicine as an internist. His only contact with thyroid surgery in Wisconsin is limited to his alleged observation of some of his former students, to whom he did not teach surgery, and whose names he could not recall, but whom he thought resided in the cities of Kenosha, Racine, Wausau, Eau Claire and Marshfield, all in Wisconsin."

Arnold v. Loose (3 Cir.) 352 F. (2d) 959, is not a medical malpractice case but presents relevant observations as to the insufficient qualification of an orthopedic surgeon to testify on the issue of whether a diabetic coma was the cause of an accident (352 F. [2d] 961):

"* * * Dr. Yund, an orthopedic surgeon, * * * was called as an expert witness for the defendant. Dr. Yund had treated Loose in the hospital emergency room shortly after the accident. It was Dr. Yund's testimony that, in his opinion, Loose had lapsed into a diabetic coma, *causing the accident*. This testimony was stricken because Dr. Yund showed no experience, knowledge or background that would qualify him sufficiently to formulate such a judgment in this particular field.

"While it is the law in Pennsylvania that a physician, testifying as an expert, should not be barred from testifying merely because he is not a specialist in the field about which he is rendering an opinion, * * * Pennsylvania has not thereby opened the door to such an extent that any doctor can testify about any medical subject without limitation. * * * On the contrary, the attorney who presents a medical expert has the initial burden of establishing his qualifications to render an opinion in a particular field. * * *

* * * * *

"* * * [S]ince Dr. Yund's testimony was relevant only as it related to the cause of the accident, the pivotal determination made by the trial judge, with which we agree, was that Dr. Yund lacked the expertise to say diabetic coma caused the accident.

"Dr. Yund's qualifications revealed no special knowledge in the field of diabetes. By his own admission he had *never* read *any* text on diabetes or diabetic comas. He did not know who was the leading authority on

diabetes nor which was the leading treatise. His field of specialization was, in fact, orthopedics. Whether Dr. Yund believed himself qualified is of no significance."

We think that where, as here, a claim of malpractice is asserted against a doctor of undoubted qualification as a result of a relatively rare occurrence arising out of a difficult medical procedure and on the basis of evidence that is both stale and tenuous, a trial court would be fully justified in requiring that another doctor who undertakes to give an expert opinion concerning the quality of treatment administered by the defendant doctor must himself make a substantial showing of qualification in the particular field of inquiry.

Affirmed.