DELORES J. MELLIN FRITZ, TRUSTEE FOR NEXT OF KIN OF WILLIAM MELLIN, AND OTHERS v. PARKE, DAVIS AND COMPANY AND OTHERS.

152 N. W. (2d) 129.

July 7, 1967—No. 40,481.

*Carroll & Perbix,* for appellants.

*Faegre & Benson, Paul J. McGough,* and *G. Alan Cunningham,* for respondent company.

*Scallen, Farnes, Evidon & Harder* and *Raymond A. Scallen,* for respondent physicians.

ROGOSHESKE, JUSTICE.

The amended complaint in this action alleged that the death of William Mellin on July 31, 1963, was caused by the negligence of defendant physicians and the negligence and breach of warranty of defendant drug company in the manufacture and sale of dilantin, a drug of choice used in controlling epilepsy prescribed for deceased by defendant physicians.

On December 21, 1961, William, aged 12, was hospitalized. Defendant physicians, general practitioners, determined in consultation with a neurologist that he was suffering from a severe type of epilepsy. In order to control the boy's epilepsy, it was decided upon the advice of the consulting neurologist that he should take 1½ grains of dilantin three times a day. William was released from the hospital on December 30, 1961. On January 13, 1962, he became ill with a high fever and a rash over much of his body. On the basis of the symptoms exhibited and the tests made, his illness was diagnosed as measles. The use of dilantin was continued. On January 31 he again became ill and was brought to the physicians' office and examined. He was "feverish," had a rash described as "morbilliform," was "jaundiced," and his "spleen and liver were enlarged and palpable." An allergic reaction to dilantin was suspected, but based upon the symptoms exhibited and the tests run, his illness was diagnosed as infectious mononucleosis. He was hospitalized and the use of dilantin was discontinued to test whether the drug was causing any reaction. On February 6, after his condition improved, the use of dilantin was readministered at one-half the prior dosage. On February 16, he was discharged from the hospital. The use of dilantin was discontinued and he was told to return periodically to the physicians' office for observation and "if there was no improvement, he was to be sent to the University." He returned to the defendant physicians' office on February 26 and again on April 11, 1962, after which he was no longer under their care. Over a year later, on July 31, 1963, William died while undergoing surgery at the University of Minnesota Hospitals. Plaintiffs' expert witness, a Washington, D. C. pediatrician and neurologist with extensive experience in treating epilepsy,

expressed the opinion that it was "highly probable that there was a toxic damage to the liver which was responsible" for William's death.

At the close of all the testimony submitted by plaintiffs and defendants to the court and a jury during the course of a 3-day trial, the court directed a verdict in favor of each of the defendants. Following denial of plaintiffs' motion for a new trial, this appeal was taken.

The only issues raised are whether there was sufficient evidence to justify a jury in finding (1) that defendant drug company was negligent or breached any warranty because it placed dilantin on the market, and (2) that the negligence of defendant physicians' treatment and care of William caused his death.

The evidence relevant to the alleged liability of defendant drug company merely established the following facts. There are at least five drugs on the market, including dilantin, which are commonly used by doctors to control epilepsy. All of these drugs cause allergic reactions in certain persons which can result in serious side effects. Dilantin is a prescription drug and has been on the market since 1938. Its use has not been disapproved by the Federal Food and Drug Administration and it is in widespread use by doctors throughout the country.

Some doctors, including plaintiffs' expert witness, are of the opinion that two other drugs, phenobarbital luminal and mysoline, are preferable to dilantin because of the side effects which result from the latter's use. Other doctors, including at least an equally qualified specialist—the consulting neurologist called by defendants—disagree and prefer dilantin over the other drugs. Dilantin has demonstrated its ability to control certain types of epilepsy and did in fact control William's epileptic seizures.

It is evident, as plaintiffs' brief and argument now apparently concede, that the record is devoid of any evidence which would support a finding of negligence or breach of warranty in the manufacture and sale of dilantin by defendant drug company.[1]

---

[1] For indications as to the proof necessary to hold a manufacturer liable, see, e. g., Webb v. Sandoz Chemical Works, Inc. 85 Ga. App. 405, 69 S. E. (2d) 689; Casagrande v. F. W. Woolworth Co. Inc. 340 Mass. 552, 165

In medical malpractice actions of this type, a physician is not required to insure the successful outcome of his treatment, nor can he be held liable for honest mistakes of judgment where reasonable doubts and uncertainties as to the proper course of treatment exist. Liability rests upon proof of negligence judged by the standard of whether or not the physician brought and applied to the case at hand that degree of skill, care, knowledge, and attention ordinarily possessed and exercised by other physicians under like circumstances in the same or a similar locality.[2]

Measured by this standard, the evidence in this case falls woefully short of establishing any negligence on the part of defendant physicians. They were clearly not negligent in their initial use of dilantin, for a physician may properly adopt a method of treatment approved by a considerable number of other physicians in good standing in his community.[3] It was undisputed that dilantin was in widespread use by physicians for controlling epileptic seizures in this state and elsewhere.

Whether defendant physicians were negligent in continuing to use dilantin is a technical medical question requiring expert testimony.[4] Opinion evidence that it was highly probable that some toxic element contributed to cause William's death is not sufficient to establish such negligence.[5] The only other evidence was the opinion expressed by the medical specialist called by plaintiffs that, based on one of defendant physicians' testimony and the medical records, William manifested an allergic reaction to dilantin. He was neither asked to give nor did his testimony reasonably imply an opinion that William's illness or death was caused by any failure to conform to the requisite skill and care required by defendant physicians.[6] Defendants' expert testimony that the care and treatment by defendant physicians did conform stands uncontradicted. Viewing the record most favorably to plaintiffs, the evidence, both opinion and factual,

N. E. (2d) 109; Keeton, *Products Liability — Liability Without Fault and the Requirement of a Defect*, 41 Tex. L. Rev. 855.

[2] 14 Dunnell, Dig. (3 ed.) § 7488; Louisell & Williams, Trial of Medical Malpractice Cases, § 8.04.

[3] Manion v. Tweedy, 257 Minn. 59, 100 N. W. (2d) 124.

[4] Miller v. Raaen, 273 Minn. 109, 139 N. W. (2d) 877.

[5] Ericksen v. Wilson, 266 Minn. 401, 123 N. W. (2d) 687.

[6] See, Hoffman v. Naslund, 274 Minn. 521, 144 N. W. (2d) 580.

requires the conclusion that the skill and care exhibited by defendant physicians' diagnosis and treatment of William's epilepsy were marked by devoted diligence and attention and were wholly consistent with the professional skill and care ordinarily employed by other physicians in treating and controlling the effects of the complex disease of epilepsy.

Affirmed.