# IRL G. LARSEN v. DR. MATTHEW D. YELLE.

246 N. W. 2d 841.

October 22, 1976—No. 46095.

*Rischmiller & Wasche* and *Robert Wm. Rischmiller*, for appellant.

*Altman, Geraghty, Mulally & Weiss* and *Terence O'Loughlin*, for respondent.

PETERSON, JUSTICE.

Plaintiff, Irl G. Larsen, sued defendant, Dr. Matthew D. Yelle, alleging that defendant was negligent in his medical treatment of a fracture of plaintiff's right wrist. At the close of plaintiff's case in chief before a jury, the district court directed a verdict for Dr. Yelle, and Larsen appealed to this court. We reverse and remand for a new trial.

Larsen fell from a stack stool at his home in Anoka on Saturday, April 22, 1972, and sustained a severely comminuted Colles fracture of the right wrist (a fracture in which the bone was splintered). He was treated by Dr. Yelle, a physician engaged in the general practice of medicine, who after viewing X rays reduced the fracture and applied a conventional circular cast

of plaster. Because of severe swelling of Larsen's wrist area, Dr. Yelle within 3 days split the cast open, first on one side then on the other side, as well. There was some slippage or shortening or settling of the bone because it was not held firmly in place, and Larsen's wrist healed in a deformed manner.

Dr. David W. Florence, an orthopedic specialist, testified that because the treatment of a severely comminuted Colles fracture is totally different from the treatment of other types of Colles fractures, it is the ordinary custom and practice of a general practitioner to refer the patient to an orthopedic surgeon for treatment. He explained that this type of fracture is usually treated by a special technique called pins and plaster, in which pins are placed for traction purposes through the hand and through the elbow, then incorporated into a plaster cast. Dr. Florence testified that the purpose of the pins and plaster technique is to prevent residual deformity, and that if pins are not used the bone fragments in the communited area will settle back causing it to "clam up like an egg shell." In Dr. Florence's opinion, if the pins and plaster technique had been used in this case, deformity would have been minimized or eliminated.

Dr. Florence implied that some general practitioners might competently treat the type of fracture which Larsen sustained, even though most refer such cases to specialists. (Dr. Yelle had already testified that he himself would not be competent to employ a pinning technique without 2 weeks of special training for that purpose.) Dr. Florence agreed that some orthopedists might not have used the pins and plaster technique but might have used some other accepted orthopedic technique instead, such as hanging the arm in pin traction for a number of days to get swelling out before even reducing the fracture or applying a cast. Dr. Florence did testify, however, that orthopedic surgeons do not apply a circular cast in the initial treatment of this type of injury because tremendous swelling is to be expected, and this swelling cannot be handled with a circular cast.

Although, according to Dr. Florence's testimony, tremendous swelling should have been anticipated, some of the swelling of Larsen's wrist area might have been associated with Sudeck's atrophy. Dr. Yelle testified that Sudeck's atrophy is a rarely encountered complication which, when it occurs, usually occurs in fractures of the wrist and ankle and is characterized by the very small blood vessels in the extremity going into spasm, causing poor circulation and consequent swelling from blood still being pumped to the area. The treatment for Sudeck's atrophy is to encourage mobilization of the affected area.

Dr. Yelle agreed that if pins had been employed prior to the onset of Sudeck's atrophy the shortening of the bone would have been prevented. Dr. Florence testified that Sudeck's atrophy can occur anywhere from 8 to 16 weeks after an injury, but admitted that it might in an extremely rare case occur as early as 2 weeks following injury. In the case at bar Dr. Yelle reduced the fracture and applied the circular cast on the date of injury. The swelling that did occur came early, and the cast was loosened 1 day after injury and split completely in two on the third day after injury. It will be for the jury to resolve the factual question to what extent the swelling resulted from normally anticipated causes or from Sudeck's atrophy. From the evidence admitted, however, the jury could have concluded that on the date of injury Dr. Yelle should have anticipated the entire extent of the swelling which occurred shortly thereafter and necessitated the loosening of the cast.

A motion for a directed verdict should not be granted if the evidence is sufficient to sustain a verdict for the opponent. Rule 50.01, Rules of Civil Procedure. In order to sustain a verdict for the plaintiff, the evidence must be sufficient for the jury to ascertain what is the requisite standard of care and to determine that defendant's conduct was a deviation from that standard.

In a negligence action the defendant is held to that standard of care which a reasonably prudent man would have exercised under the same circumstances, although in a medical malpractice

case the learning and experience of a physician in good standing in his profession must be incorporated into the definition of a reasonably prudent man. Miller v. Raaen, 273 Minn. 109, 113, 139 N. W. 2d 877, 879 (1966). That is to say, the defendant is required at a minimum to exercise that degree of skill, care, knowledge, and attention ordinarily possessed and exercised by other physicians under like circumstances in the same or a similar locality. Fritz v. Parke Davis & Co. 277 Minn. 210, 152 N. W. 2d 129, 30 A. L. R. 3d 982 (1967). Often the requisite standard of care is of necessity demonstrated by expert testimony (see, Todd v. Eitel Hospital, 306 Minn. 254, 257, 237 N. W. 2d 357, 359 [1975]), although as the public, and consequently jurors, have become increasingly familiar with medical techniques the requisite standard has frequently been satisfactorily established without the use of expert testimony (see, Hestbeck v. Hennepin County, 297 Minn. 419, 212 N. W. 2d 361 [1973]; Miller v. Raaen, *supra*; and cases there cited).

In the case at bar the evidence was sufficient for the jury to conclude that a reasonably prudent man having and exercising the skill, care, knowledge, and attention ordinarily possessed and exercised by physicians in good standing would have recognized, first, that plaintiff's fracture was of such a nature that tremendous swelling would soon occur and, second, that if a circular plaster cast were applied, this swelling would require the loosening of the cast to such an extent that the bone fragments could not be held in a stable position, thereby resulting in deformity of the wrist. The evidence was also sufficient for the jury to conclude that in light of those facts a reasonably prudent physician would not have applied a circular cast but would have caused some superior method of treatment to be employed, that Dr. Yelle did apply a circular cast instead of causing the plaintiff to receive a different form of treatment, and that Dr. Yelle's conduct was the cause of the deformity of plaintiff's wrist.

Plaintiff's primary theory of the case was as follows: (1)

When confronted with a fracture of the type sustained by plaintiff in the case at bar, the standard of care required of a general practitioner like Dr. Yelle is that he refer the patient to an orthopedic surgeon rather than attempt treatment himself, (2) Dr. Yelle deviated from this standard by failing to refer the case to an orthopedic surgeon and instead undertaking to treat it himself, and (3) plaintiff was injured by Dr. Yelle's deviation from the requisite standard. It is true that one of the requirements which the law exacts of general practitioners of medicine is that if, in the exercise of the care and skill demanded by those requirements, such a practitioner discovers, or should know or discover, that the patient's ailment is beyond his knowledge or technical skill, or ability or capacity to treat with a likelihood of reasonable success, he is under a duty to disclose the situation to his patient, or to advise him of the necessity of other or different treatment. See, Manion v. Tweedy, 257 Minn. 59, 65, 100 N. W. 2d 124, 128 (1959). If under such circumstances the general practitioner fails to inform the patient and undertakes to treat when he should refer to a specialist, he will be held to that standard of care required of the specialist. That is, in order to escape liability for injury caused by his treatment, the treatment he himself administers to the patient must at a minimum comply with that degree of skill, care, knowledge, and attention ordinarily possessed and exercised by specialists in good standing under like circumstances.

It is important to note, however, that the mere breach of duty to refer a patient to a specialist for treatment will not of itself make out a prima facie case of negligence against the general practitioner. This is so because the treatment which the general practitioner administers may in fact be the exact treatment which a specialist in good standing would have employed had the case been referred to him, and in that circumstance the general practitioner would be no more liable for injury resulting from the treatment than would be the specialist had he administered the treatment. It must appear that the breach of the duty to

refer to a specialist in fact caused the plaintiff's injury, and this can be shown only if the treatment the plaintiff received was in some way inferior to the treatment he would have received from a specialist. Thus, in order to make out a case of negligence based on a breach of a duty to refer a patient to a specialist for treatment, the plaintiff must also present evidence from which the trier of fact may determine that in the treatment which he in fact administered, the defendant failed to exercise that degree of skill, care, knowledge, and attention ordinarily possessed and exercised by specialists in good standing under like circumstances.

Dr. Florence testified it was the "custom and practice" of general practitioners to refer the treatment of a fracture such as was sustained by plaintiff to an orthopedic surgeon. He also testified that the type of fracture which plaintiff sustained is usually treated by the pins and plaster technique, and Dr. Yelle himself testified that he would not have been competent to employ a pinning technique without an additional 2 weeks of training. While the phrasing of Dr. Florence's testimony in terms of the "custom and practice" of general practitioners was perhaps not as helpful as if the crucial questions had been worded in the exact terms of the requisite standard itself, the jury could have concluded, based on the testimony it had, that Dr. Yelle's failure to refer the treatment of plaintiff's wrist fracture to an orthopedic surgeon was a deviation from that degree of skill, care, knowledge, and attention ordinarily possessed and exercised by other physicians in good standing under like circumstances.

Had the jury so concluded, it would then have proceeded to determine whether the treatment which Dr. Yelle administered instead of referring plaintiff to an orthopedic surgeon for treatment was a deviation from the standard of care required of a orthopedic surgeon.

Dr. Florence's testimoy did not elucidate with great clarity the exact nature of those forms of treatment which he believed an orthopedic surgeon would have employed in the treatment

of plaintiff's wrist. At one point he testified this type of fracture is usually treated by the pins and plaster technique, while later he suggested that other acceptable techniques existed, and still later he testified that orthopedic surgeons would employ anterior and posterior splints in order to accommodate the anticipated swelling. Dr. Florence did, however, unequivocally testify that orthopedic surgeons do not employ circular casts in the treatment of these fractures because of the anticipated swelling. Any inconsistencies in Dr. Florence's testimony may well be used in cross-examination to impeach his credibility, but possible inconsistency in the testimony of a witness does not mean that his testimony cannot support a verdict. Dr. Florence's testimony was sufficient for the jury to conclude that the treatment which Dr. Yelle administered was a deviation from the degree of skill, care, knowledge, and attention ordinarily possessed and exercised by orthopedic surgeons in good standing under like circumstances.

Reversed.

ROGOSHESKE, JUSTICE (concurring specially).

I concur in the result, being persuaded that the trial court on this record should not have directed a verdict at the close of plaintiff's case in chief. At that point in the trial, had defendant offered no evidence, expert medical testimony viewed most favorably to plaintiff's theory of liability would have permitted a jury finding that the treatment of plaintiff's fracture did not conform to the required standard of medical care, proximately causing a deformity to plaintiff's right wrist.

MR. JUSTICE OTIS took no part in the consideration or decision of this case.