**SCHMITZ, Admr., Appellant,**

v.

**BLANCHARD VALLEY OB–GYN, INC. et al., Appellees.**

[Cite as *Schmitz v. Blanchard Valley OB–GYN, Inc.* (1989), 63 Ohio App.3d 756.]

Court of Appeals of Ohio,
Hancock County.

No. 5–87–15.

Decided Sept. 26, 1989.

*Michael F. Colley Co., L.P.A.,* and *David W. Sumner,* for appellant.

*Schumaker, Loop & Kendrick, John C. Barron* and *Thomas M. Wood,* for appellees.

MILLER, Judge.

This is an appeal by plaintiff, Rodney A. Schmitz, administrator of the estate of Madonna L. Schmitz, from a judgment of the Court of Common Pleas of Hancock County, in favor of defendants, Blanchard Valley OB–GYN, Inc., Emil C. Zeigler, M.D., George V. Hassink, M.D., Allan T. Tong, M.D., and Joseph A. Weingates, M.D., employees of Blanchard Valley OB–GYN, Inc.

The case was filed by plaintiff as a medical malpractice and wrongful death action.

Decedent, Madonna L. Schmitz, was a patient of the defendants who managed the decedent's pregnancy and her 1982 delivery at Blanchard Valley Hospital.

Plaintiff contends that the defendants violated the standard of care owed Madonna Schmitz in the management of her pregnancy by failing to consult a specialist in cardiology when they knew or should have known that she had a history of a corrected coarctation of the aorta and other cardiovascular disorders. Plaintiff further claims that defendants violated the standard of care owed by a physician in the practice of a specialty by failing to consult with a cardiologist when it became known to the defendants that the decedent was also suffering from hypertension during the pregnancy.

On August 10, 1982, defendant Dr. Tong, upon examining the decedent, determined that she was suffering from elevated blood pressure which he diagnosed as pregnancy-induced hypertension and instructed her to get bed rest. Subsequently, the decedent's blood pressure returned to normal. On September 10, 1982, Dr. Tong, at the Blanchard Valley OB–GYN, again found the decedent's blood pressure to be elevated and prescribed bed rest. On

September 13, 1982, defendant Dr. Zeigler, after examining the decedent and observing swelling and hypertension, admitted Madonna Schmitz to the hospital for treatment. That evening, the decedent went into labor and later delivered a four-pound eight-ounce baby girl.

On September 15, 1982, Madonna Schmitz died as a result of a rupture of a dissecting aortic aneurysm of the ascending aorta.

At trial, the plaintiff requested the trial court to instruct the jury on the "assumed duty" doctrine. Plaintiff's proposed jury instructions numbers 5 and 6 are as follows:

"5. It has been specifically alleged in this section that Defendants Dr. Zeigler, Dr. Hassink, Dr. Weingates and Dr. Tong failed to exercise required skill, care or diligence by failing to obtain consultation from a specialist trained or experienced in treating heart or vascular disorders or in failing to refer the patient to such specialists. If you find by a preponderance of the evidence that consultation or consultations by the defendant doctors with other specialists were required under the standard of care applicable to similarly situated obstetrician-gynecologists, then the defendant physicians may be considered to have 'assumed the duty' of caring for and treating Madonna Schmitz consistent with standards of care applicable to physicians specializing in the care or treatment of such heart or cardiovascular disorders. The defendants' assumption of duty in treating the heart or cardiovascular disorder places the responsibility upon the physicians to provide care consistent with the standard of care applicable to physicians specializing in the care of such disorders.

"6. If you find from the evidence that defendants Dr. Zeigler, Dr. Hassink, Dr. Weingates or Dr. Tong failed to exercise the appropriate degree of skill, care and diligence in the medical management of Madonna Schmitz's pregnancy or cardiovascular disorder, or if you find a defendant doctor failed to comply with an 'assumed duty' of care, if applicable, imposed by their failure to seek consultations from other specialists, then you may find that these acts constitute negligence. * * *"

The trial court denied the plaintiff's request, the case was submitted to the jury, and the jury returned a verdict in favor of the defendants.

Plaintiff appeals setting forth one assignment of error:

"The trial court abused its discretion to the substantial prejudice of appellant by failing to instruct the jury on standard of care consistent with appellant's 'assumed duty' instructions submitted to the trial court through plaintiff's proposed jury instructions Nos. 5 and 6."

Plaintiff contends that the trial court committed prejudicial error in refusing to instruct the jury on the "assumed duty" doctrine which he argues is applicable in cases where a physician is negligent for failing to consult with another medical specialist. In this case, plaintiff claims the defendants, by failing to consult a specialist in cardiology, "assumed the duty" of a cardiologist, and subsequently breached that duty by failing to properly treat the decedent's condition.

Plaintiff relies on *Larsen v. Yelle* (1976), 310 Minn. 521, 246 N.W.2d 841, to support his position that an instruction on the "assumed duty" doctrine should have been given in this case. In *Larsen, supra,* the Supreme Court of Minnesota set forth the circumstances in which the duty to refer applies:

"[O]ne of the requirements which the law exacts of general practitioners of medicine is that if, in the exercise of the care and skill demanded by those requirements, such a practitioner discovers, or should know or discover, that the patient's ailment is beyond his knowledge or technical skill, or ability or capacity to treat with a likelihood of reasonable success, he is under a duty to disclose the situation to his patient, or to advise him of the necessity of other or different treatment."

Therefore, if under the circumstances a duty is established and the plaintiff shows the physician breached the duty, the physician will be held to that standard of care required of the speciality to which the referral should have been made.

However, the court in *Larsen, supra,* at 525–526, 246 N.W.2d at 845, stated:

"It is important to note, however, that the mere breach of duty to refer a patient to a specialist for treatment will not of itself make out a prima facie case of negligence against the general practitioner. * * * It must appear that the breach of the duty to refer to a specialist in fact caused the plaintiff's injury, and this can be shown only if the treatment the plaintiff received was in some way inferior to the treatment he would have received from a specialist. Thus, in order to make out a case of negligence based on a breach of duty to refer a patient to a specialist for treatment, the plaintiff must also present evidence from which the trier of fact may determine that in the treatment which he in fact administered, the defendant failed to exercise that degree of skill, care, knowledge, and attention ordinarily possessed and exercised by specialists in good standing under like circumstances."

In the *Larsen* case the evidence was that it was the ordinary custom and practice to make a referral for treatment of the situation involved. *Id.* at 522–523, 246 N.W.2d at 843.

In a subsequent Minnesota case, *Lane v. Skyline Family Medical Ctr.* (Minn.App.1985), 363 N.W.2d 318, an appellate decision, the court, applying the principles set forth in *Larsen, supra,* held that the trial court did not commit error by refusing to instruct the jury on a defendant family physician's duty to refer a twin-pregnancy patient to a specialist where there is no testimony indicating that a specialist would have been better qualified to treat a patient with the mother's symptoms. In addition, the *Lane* court stated that "if a duty to refer existed and Dr. Hiza breached that duty, plaintiffs still needed to establish the final element under *Larsen:* that Hiza's care did not meet a specialist's standards." *Id.* at 323.

No testimony was introduced at trial which tends to support the conclusion that a specialist in cardiology would have been better qualified to manage a patient's case with Madonna Schmitz's symptoms. Plaintiff's own expert witness, Dr. Fontana, who testified that in her opinion a cardiologist should have been consulted during the pregnancy, also testified as follows:

"Q  Doctor, let me try to approach it from this direction. When I came to Columbus, didn't I ask you the following question. 'Do you think that there would be a reputable minority, 10, 20 percent of cardiologists competent, well educated, Board Certified, who would feel other than you do about the management of this case.' Did you not respond to that question by saying, 'I'm sure there are'?

"A  Yes, because I don't think 100 percent of people agree on anything.
" * * *

"Q  Doctor, directing your attention to the bottom of page 64 and the top of page 65, does not the following—was not the following question put to you? 'That would feel that under the facts and circumstances of this case the management rendered was inadequate?' And did you not respond by saying, 'I'm sure you could find people who would feel that way.'

"A  That's what I said.
" * * *

"Q  And can't we go on to agree that though you might feel that they are in a minority position in your field that that would still be acknowledged and respected minority; correct? I asked you that question?

"A  Yes.

"Q  And did you not go on to say that, 'I think that's true, because in this particular situation the exact pathology reasons for dissection are not iron-clad. It's not a totally understood phenomena, so I think in the absence of adequate documentation in medical literature you're going to find differing opinions about the approach to the problems in cases where they are not

blatantly severely hypertensive and that sort of thing. I think that you're going to find differing opinions, and it's a matter of what I have expressed here today, is my opinion on how I would have handled this case given the information available to me and the philosophy I have developed.' Was that not your answer?

"A   That's my answer."

Further, Dr. Mortimer G. Rosen, a witness for the plaintiff, testified as follows:

"Q   And with all of that effort and work, it remains the fact, does it not, that you can't say to a reasonable medical probability or certainty that altering Madonna Schmitz's care in any way would probably have prevented her death?

"A   That's correct."

In addition, Dr. Jerome F. Beekman, a cardiologist who examined Madonna Schmitz at the beginning of her pregnancy to determine whether she would be at an increased risk if she became pregnant, testified:

"Q   * * * Doctor, I'd like to ask you a hypothetical question now, about that hospital admission. Doctor, if you had been consulted during that hospitalization, would you have deferred to the obstetricians regarding the selection of medication to lower blood pressure?

"A   Yes, I would have.

"Q   Okay. Would you explain why, based upon your speciality and training, why you would have done that?

"A   My feeling is that when you are dealing with a lady that's pregnant, you're not only dealing with the adult, but also with the unborn baby, and I think that the obstetricians in general are best trained people to decide what is safe and what is not a safe drug to give to a person with preeclampsia as far as writing orders or giving medications. I would defer to the obstetricians."

In *Tirpak v. Weinberg* (1986), 27 Ohio App.3d 46, 27 OBR 49, 499 N.E.2d 397, the court stated at 51, 27 OBR at 54, 499 N.E.2d at 402:

"The longstanding rule in Ohio is that the trial court is not bound to give 'an instruction dealing in generalities and not linked to the parties and connected with the issues in the particular case.' *Bradley v. Mansfield Rapid Transit* (1950), 154 Ohio St. 154 [42 O.O. 221, 93 N.E.2d 672], overruled on other grounds (1966), 6 Ohio St.2d 192 [35 O.O.2d 307, 217 N.E.2d 217], cited in *Walczesky v. Horvitz Co.* (1971), 26 Ohio St.2d 146 [55 O.O.2d 277, 269 N.E.2d 844]. * * *"

In *Tirpak, supra,* the court also stated at 51, 27 OBR at 49, 499 N.E.2d at 402:

"In order to support a reversal of judgment, the error must be prejudicial. [Citations omitted.] [A]ppellants have the burden under Ohio law to establish more than just a mere possibility of prejudice. * * * " (Emphasis deleted.)

Even assuming a duty to refer existed and the defendants breached that duty, plaintiff still failed to show that the treatment Madonna Schmitz received was in some way inferior to the treatment she would have received from a cardiologist in good standing and under the like circumstances.

The refusal of the trial court to give the instruction requested was not prejudicially erroneous.

Finding no error of the trial court prejudicial to the plaintiff as assigned and argued, we affirm the trial court's judgment.

*Judgment affirmed.*

EVANS, P.J., and SHAW, J., concur.