Donna L. JOHNSON, by her Guardian Ad Litem, Timothy J. Adler, Plaintiff-Respondent,†

v.

Dr. Richard KOKEMOOR, Physicians Insurance Company of Wisconsin and Wisconsin Patients Compensation Fund, Defendants-Appellants,††

SACRED HEART HOSPITAL, Wisconsin Healthcare Liability Plan, Wisconsin Department of Health & Social Services and Healthcare Financing Administration, Defendants.

Court of Appeals

*No. 93–3099. Oral argument August 19, 1994.—Decided October 4, 1994.*

(Also reported in 525 N.W.2d 71.)

†Petition to review granted.
††Petition to cross review granted.

204

On behalf of defendants-appellants, the cause was submitted on the brief of *Douglas J. Klingberg* and

*James F. Harrington* of *Ruder, Ware & Michler, S.C.* of Wausau and orally argued by *Douglas J. Klingberg*.

On behalf of plaintiff-respondent, the cause was submitted on the brief of *D. Charles Jordan, Dana J. Wachs* and *Heidi L. Atkins* of *Jordan & Wachs* of Eau Claire and orally argued by *D. Charles Jordan*.

Before Cane, P.J., LaRocque and Myse, JJ.

LaROCQUE, J. Doctor Richard Kokemoor appeals a nonfinal order denying his motions to change the answers in the special verdict or, in the alternative, for a new trial. A jury found Donna Johnson was injured when Kokemoor failed to adequately inform her of the risks of surgery. Kokemoor argues that the court erred by admitting the following evidence: (1) That he had limited experience performing the surgical procedure, (2) that Johnson's risk of a bad outcome from the procedure was approximately 10% in the hands of a master surgeon, 15% on average, and 20% to 30% in Kokemoor's hands, and (3) that Kokemoor should have advised Johnson of, and referred her to, more experienced surgeons.

We conclude that the court erred by (3) above, admitting evidence that Kokemoor should have advised Johnson of, and referred her to, more experienced surgeons. In contrast to a medical malpractice action, in an action for failure to obtain informed consent, the action pursued by Johnson here, the jury need only find a failure to inform and that a reasonable person in the patient's position would not have consented had she been properly informed. On the other hand, had Johnson pursued an action for failure to refer to another surgeon, i.e., medical malpractice, proof would have been required that the defendant per-

formed the surgery in a negligent manner. Because there was no proof or finding that Kokemoor negligently performed the surgery and, because the failure to refer was not relevant to the claim made, there is a reasonable possibility that the jury used this improper evidence as the basis to find that the failure to refer caused Johnson to consent to the surgery with Kokemoor.[1] The error was therefore not harmless, and we reverse and remand for a new trial.

## BACKGROUND

Donna Johnson underwent a CT scan on the advice of her family physician, Dr. Romulo Sanchez. The purpose was to try to determine the cause of her headaches. Sanchez then referred Johnson to Dr. Kokemoor, a neurosurgeon in the Chippewa Falls area. Kokemoor reviewed the new scans, compared them to older ones, and diagnosed an enlarging aneurysm at the bifurcation of Johnson's basilar artery.[2] The aneurysm is known as a posterior circulation aneurysm because the basilar artery is located at the rear of the brain, in front of and beneath the brain stem. Kokemoor recommended surgery to clip the aneurysm,

---

[1] The parties agreed to the form of the special verdict duty and cause questions, as follows:

Question 1: Did Dr. Richard Kokemoor fail to adequately inform Donna Johnson of the risks and advantages of her surgery?
Question 2: If you have answered question 1 "yes", then and then only answer this question:

Would a reasonable person in Donna Johnson's position have refused to consent to the surgery *by Dr. Richard Kokemoor* had she been informed of the risks and advantages of the surgery?

(Emphasis added.)

[2] An aneurysm is a weakening of the blood vessel that causes a ballooning of the vessel wall.

and Johnson agreed to undergo the procedure. Prior to surgery, Johnson suffered no neurological impairments. The operation was performed in October 1990. While Kokemoor's surgical notes indicate the operation was technically successful, Johnson was rendered an incomplete quadriplegic. She remains unable to walk or control her bowel or bladder. Her vision, speech and upper body motor coordination are all partially impaired.

Johnson sued Kokemoor for negligently failing to obtain her informed consent to perform the operation. Prior to trial, Kokemoor brought a motion in limine seeking to exclude the introduction of any evidence of Kokemoor's surgical experience with aneurysm surgery or the availability of alternative surgeons and facilities more experienced than Kokemoor. The court ruled that evidence of the extent of Kokemoor's experience clipping basilar bifurcation aneurysms was relevant admissible evidence. Additionally, the court ruled Johnson could present expert testimony that Kokemoor should have advised Johnson of, and referred Johnson to, more experienced neurosurgeons.

At trial, Johnson presented evidence supporting her claim that she did not give informed consent. Under her version of events, Kokemoor told her that her aneurysm was growing rapidly and recommended that he perform surgery. When discussing surgical risks, he told her that clipping a basilar bifurcation aneurysm had a 2% risk of a bad outcome, meaning death or impairment. He explained that the surgery was less risky than the angiogram procedure she would need to undergo in preparation for surgery. He explained that the surgery was no different from any other type of surgery such as a tonsillectomy, appendix or gall bladder surgery. When asked by Johnson how

many times he had performed this procedure, Kokemoor responded "several" times, which he defined as "dozens."

Johnson presented evidence indicating Kokemoor had overstated the urgency for the procedure and his experience with the particular procedure. Experts testified, and Kokemoor conceded, that there was no basis for concluding that the aneurysm was growing rapidly. While Kokemoor had signed a hospital form indicating Johnson's surgery was an emergency, he conceded her surgery was not in fact an emergency. While Kokemoor had previously clipped a few dozen aneurysms, nearly all of these were anterior circulation aneurysms; he admitted to having clipped posterior basilar bifurcation aneurysms only twice before.

Evidence also indicated Kokemoor had understated the morbidity and mortality rate. Kokemoor conceded the risk from clipping Johnson's aneurysm was greater than that of an angiogram, and absolutely not comparable to the risk of a tonsillectomy, appendix or gall bladder surgery. In a report readily available to Kokemoor, the world's acknowledged master aneurysm surgeon reported morbidity and mortality rate of 10.7% for basilar bifurcation aneurysms comparable in size to Johnson's. Kokemoor conceded he was unable to match that rate. Information available in treatises and articles Kokemoor reviewed in preparation for surgery indicated a morbidity and mortality rate of approximately 15% for a basilar bifurcation aneurysm. Experts opined that given Kokemoor's limited experience with the procedure, he may have a morbidity and mortality rate between 20-30%. They further testified that, given his limited experience, Kokemoor should have advised Johnson of the availability of more experienced surgeons and better equipped facilities at which

211

she could undergo the surgery. Finally, they suggested Kokemoor should have referred this case to such surgeons and facilities.

Kokemoor's version of events differed from Johnson's. He testified that he did not suggest to Johnson her procedure was an emergency. With regard to surgical risk, he testified that he never told her the risk was comparable to that of an angiogram. He explained that he mentioned the morbidity and mortality risks of less dangerous surgical procedures such as tonsillectomies only to demonstrate to Johnson that any surgery contains risks, but he maintained he never suggested the risks were similar. He told her the risk for clipping aneurysms was in the range of 2% but that due to the location of her aneurysm, the risk was greater though he was unable to state how great a risk she faced. Kokemoor maintained that this information accurately conveyed the procedure's risk to Johnson because the morbidity and mortality rate for all aneurysms, anterior and posterior, is approximately 2%. He explained to her that these risks were calculated over large populations and that as to her, the risk would either occur or not, and if it did occur the risk to her would be 100%. Kokemoor maintained this disclosure adequately informed Johnson of the risks she faced, and that she knew there was a very real risk of death or stroke.

The jury found that Kokemoor failed to obtain Johnson's informed consent and that this was a cause of her injuries. The special verdict asked whether Kokemoor failed to adequately inform Johnson of the risks and advantages of surgery. It also asked whether a reasonable person in Johnson's position would have refused surgery with Kokemoor had she been informed of the risks and advantages of surgery. The jury answered both questions "yes." Because the trial was

bifurcated and the jury considered only the liability issue, damages were not determined. Kokemoor filed motions after verdict seeking to change the verdict answers from "yes" to "no," and in the alternative for a new trial. The court denied the motions in a nonfinal order. We granted Kokemoor's petition for leave to appeal.

Kokemoor's basic argument is that the trial court erroneously admitted evidence that unfairly prejudiced him, and thus a new trial is required. He argues that Wisconsin's informed consent law does not require a doctor to disclose comparative experience or physician-related risks. Thus, he claims, the court erred by admitting testimony of his own limited experience compared to that of master neurosurgeons. Additionally, he claims the court also erred by allowing testimony that he should have advised Johnson as to the availability of more experienced surgeons and referred her to them. He asserts he was unfairly prejudiced because the jury was allowed to infer from this evidence that Johnson was injured, not because he had failed to adequately inform her, but because he negligently performed the operation below the level of the masters.

## DISCUSSION

A trial court's decision to admit or exclude evidence is a discretionary determination that will not be upset on appeal if it has a reasonable basis and was made in accordance with the facts of record. *State v. Jenkins*, 168 Wis. 2d 175, 186, 483 N.W.2d 262, 265 (Ct. App. 1992). If the court's decision is supportable by the record, we will not reverse even if the trial court gave the wrong reason or no reason at all. *Id.* In reviewing the record, we draw all inferences favorable to the

verdict. *Bennett v. Larsen Co.*, 118 Wis. 2d 681, 705, 348 N.W.2d 540, 554 (1984). If the court made an evidentiary error, reversal or a new trial is only required where the improper admission of evidence has affected the substantial rights of the party seeking relief on appeal. *Heggy v. Grutzner*, 156 Wis. 2d 186, 196, 456 N.W.2d 845, 850 (Ct. App. 1990); § 805.18(2), STATS. This is a harmless error test. *Heggy*, 156 Wis. 2d at 196, 456 N.W.2d at 850. Under this test, we only reverse where there is a reasonable possibility that the error contributed to the final result. *Id.* at 197, 456 N.W.2d at 450 (citing *State v. Dyess*, 124 Wis. 2d 525, 543, 370 N.W.2d 222, 232 (1985)).

We begin by reviewing Wisconsin's law of informed consent. Wisconsin's preeminent case on informed consent to medical treatment is *Scaria v. St. Paul Fire & Marine Ins. Co.*, 68 Wis. 2d 1, 227 N.W.2d 647 (1975). In *Scaria*, the court clarified that an action based on failure to give informed consent is an action in negligence. As with any negligence cause of action, the *Scaria* court made clear a plaintiff must prove a breach of duty that causes injury. In discussing the duty-breach prong of the equation, the court explained:

> [T]he duty of the doctor is to make such disclosures as appear reasonably necessary under circumstances then existing to enable a reasonable person under the same or similar circumstances confronting the patient at the time of disclosure to intelligently exercise his right to consent or to refuse the treatment or procedure proposed.

*Id.* at 13, 227 N.W.2d at 654. This duty was imposed because a patient "cannot make a rational reasonable judgment unless [the patient] has been reasonably

informed by the doctor of the inherent and potential risks." *Id.* at 12, 227 N.W.2d at 653. The duty to disclose has some limitations. A doctor need not disclose technical information that will not likely be understood or extremely remote risks that might only cause alarm. *Id.* at 12-13, 227 N.W.2d at 653.

This *Scaria* duty essentially was codified in 1981 by § 448.30, STATS., which states:

> Information on alternate modes of treatment. Any physician who treats a patient shall inform the patient about the availability of all alternate, viable medical modes of treatment and about the benefits and risks of these treatments. The physician's duty to inform the patient under this section does not require disclosure of:
>
> (1) Information beyond what a reasonably well-qualified physician in a similar medical classification would know.
>
> (2) Detailed technical information that in all probability a patient would not understand.
>
> (3) Risks apparent or known to the patient.
>
> (4) Extremely remote possibilities that might falsely or detrimentally alarm the patient.
>
> (5) Information in emergencies where failure to provide treatment would be more harmful to the patient than treatment.
>
> (6) Information in cases where the patient is incapable of consenting.

█

The statute tracks the common law of *Scaria* in nearly identical language. *Martin v. Richards*, 176 Wis. 2d 339, 362, 500 N.W.2d 691, 702 (Ct. App. 1993) (Eich, C.J., dissenting). The parties agree, we believe cor-

rectly, that § 448.30, STATS., did not change the common law, but is merely read in conjunction with it. *See, e.g.,* WIS JI— CIVIL 1023.2 and comment (incorporating elements of *Scaria* and § 448.30).

*Scaria* also explained the causation requirements in an informed consent action. Quoting the objective, reasonable person approach enunciated in the seminal informed consent case *Canterbury v. Spence,* 464 F.2d 772 (D.C. Cir. 1972), the *Scaria* court stated:

> Better it is . . . to resolve the causality issue on an objective basis: in terms of what a prudent person in the patient's position would have decided if suitably informed of all perils bearing significance. If adequate disclosure could reasonably be expected to have caused that person to decline the treatment because of the revelation of the kind of risk or danger that resulted in harm, causation is shown, but otherwise not.

*Scaria,* 68 Wis. 2d at 14, 227 N.W.2d at 654 (quoting *Canterbury,* 464 F.2d at 791); *see also* WIS JI— CIVIL 1023.3 and comment. With these legal principles in mind, we turn to evaluate the admissibility and prejudicial effect of the evidence objected to by Kokemoor.

■

We conclude, in light of evidence that Johnson made inquiry of Kokemoor's experience and got a misleading response, that it was not error to admit evidence of the surgeon's limited experience. The evidence that Kokemoor had never clipped a basilar bifurcation aneurysm in his residency, and had done so only twice before Johnson's operation, was relevant. Relevant evidence is any evidence "having any tendency to make the existence of any fact that is of consequence to the determination of the action more

probable or less probable than it would be without the evidence." Section 904.01, STATS.

■■■

Johnson asked Kokemoor how often he had performed this procedure. Kokemoor led her to believe he had done it dozens of times. Evidence that he had in fact only done this particular procedure twice before tended to impeach his representation and show he had overstated his experience. Kokemoor tried to demonstrate that his statement accurately represented his experience because he had performed dozens of other aneurysm and brain surgery procedures, which were relevant to his ability to do Johnson's surgery. The jury was entitled to reject his view and find that when he was asked how often he had done a specific procedure, a reasonable person in Johnson's circumstances would reasonably need an accurate answer to intelligently exercise her right to consent or refuse the surgery.

We also conclude, in light of Kokemoor's decision to portray the probability of a bad result in statistical terms and evidence that statistics were inaccurate, that it was not error to admit evidence that the morbidity and mortality rate for this procedure in the hands of the world's master surgeon was 10.7% and that treatises available to Kokemoor placed the risk generally at 15%. Kokemoor argues that this evidence was inadmissible because informed consent law does not require a physician to give a patient morbidity and mortality statistical rates, and such statistics may be too easily manipulated to suggest a doctor understated a surgical risk. Kokemoor suggests just such a manipulation occurred here. He claims he disclosed a risk that was somewhat greater than 2%, and that such disclosure was technically accurate given that 2% is the rate for

217

all aneurysms and he conveyed to Johnson her risk was somewhat greater due to its location.

■

Decisions from other jurisdictions support Kokemoor's claim that informed consent law does not *require* the giving of statistical risk percentages.[3] However, we need not decide that issue. Kokemoor acknowledges the law requires disclosure of treatment risks, and that treatment risks are a function of both the gravity of the potential harm that might occur and the probability of such occurrence. Kokemoor chose to portray the probability of a bad result occurring in statistical terms, and at trial he maintained that his representation was not misleading. Evidence that in the best hands the morbidity and mortality rate was 10.7% and on average with experienced surgeons was 15% was thus properly admissible to demonstrate Kokemoor had in fact understated the probability of a bad outcome. The jury was entitled to find this evidence more accurately stated the true statistical risk to Johnson, and that, given the availability of such infor-

---

[3] For example, in *Kennedy v. St. Charles Gen'l Hosp. Aux.*, 630 So. 2d 888 (La. Ct. App. 1993), the court held that statistical percentages of risk need not be given for many of the same reasons Kokemoor suggests. After reviewing precedent, the court noted:

> We find nothing in the above cited language that mandates the giving of percentages of risks for surgical procedures. Indeed, our courts have traditionally recognized that medicine is an inexact science. As such, the notion that the physician can give accurate percentages for a risk being realized in a surgical procedure is foreign to the field of medicine. . . . *Rather, since the figures undoubtedly vary, Dr. Schwartz could very well have been faced with a charge of misrepresentation had he given a percentage later determined to be inaccurate.*

*Id.* at 892-93 (citations omitted, emphasis added).

mation, he did not make a reasonable disclosure to Johnson under the circumstances.

We similarly conclude, in light of Kokemoor's representation that he had done the procedure dozens of times and that the risk of a bad outcome was 2%, that it was not error to admit expert opinion testimony that the morbidity and mortality rate risk from Kokemoor performing the procedure was 20-30%. Kokemoor argues that under informed consent law, a physician need not disclose physician-related risks of treatment, meaning the morbidity and mortality rate adjusted to reflect the experience of the disclosing physician. Because there is no such duty, he concludes that the court erred by admitting testimony that Johnson faced a 20-30% morbidity and mortality rate from Kokemoor, and that this error unfairly prejudiced him. We disagree with his conclusion.[4]

---

[4] Other jurisdictions considering this issue have concluded that informed consent requires disclosure of information that will give the patient a sense of the risks the patient faces from the individual disclosing physician. In *Hales v. Pittman*, 576 P.2d 493, 500 (Ariz. 1978), the Arizona Supreme Court stated:

> To properly weigh the advantages of elective surgery with its attributable disadvantages, a person needs information not only concerning the statistical probabilities of various adverse results which have been encountered by other physicians, but also one is entitled to information concerning the treating physician's experiences with the particular procedure. For example, assume that as a reasonable medical probability only three percent of all patients die during a given procedure. The meaning of this statistic becomes quite another matter if Dr. "A" has never attempted the operation; Dr. "B" has performed 100 operations with a one percent mortality rate and Dr. "C" has encountered a 15 percent mortality rate in his 40 operations. Yet, if the only information given the patient was the general statistical abstract for the United States, how could

Because Kokemoor chose to couch the risk in terms of percentages, and because Johnson inquired of Kokemoor's own experience, the admission of evidence of the risk Johnson faced from Kokemoor was consistent with *Scaria*. *Scaria* requires the disclosure of all information reasonably necessary under circumstances then existing to enable a reasonable person under the same or similar circumstances confronting the patient to intelligently exercise the right to consent. In this case, there was a large quantity of evidence indicating basilar bifurcation aneurysms are

that person intelligently determine which, if any, of these physicians to choose?

In *Nisenholtz v. Mount Sinai Hosp.*, 483 N.Y.S.2d 568, 571 (1984), the court stated that in addition to identifying the risk and the likelihood of its occurrence, a doctor may also be obligated to disclose:

the "mechanics" by which harm could occur. A "very slight" risk to the general population could become a substantial risk to a somewhat susceptible patient, being treated by a physician of less than average competence or experience, using a procedure with which the physician was unfamiliar. Only through receiving a more thorough explanation of the mechanisms by which a proposed procedure could result in undesired effects may such patients adequately evaluate whether or not to undergo treatment.

Some scholars agree that physicians have a duty to disclose information identifying the doctor as an independent risk factor to the patient in certain circumstances. *See, e.g.,* Aaron D. Twerski & Neil B. Cohen, *Comparing Medical Providers: A First Look at the New Era of Medical Statistics*, 58 BROOK. L. REV. 5, 28-29 (1992) ("This information relates directly to the results likely to flow from a decision to have this provider perform this procedure. It is not difficult to conclude that a reasonable doctor should provide this potentially outcome determinative information to the patient and that a reasonable patient would want this information as part of a decision-making process.").

the most difficult to operate on successfully and that the amount of prior experience performing the procedure plays an enormous role in reducing morbidity and mortality rates. Kokemoor's own expert testified that morbidity and mortality rates for the procedure could be as high as 75% in the hands of some doctors. Because Kokemoor opted to couch the risk in terms of percentages, and because Johnson inquired of Kokemoor's own experience, this evidence was relevant to the issue of duty and causation in this case.

We do not suggest that generally a physician has a duty to disclose statistics to inform a patient of the risk. However, when the physician chooses that option, and where inquiry is made by the patient of the physician's personal experience, we conclude that opinion testimony of the patient's risk from that physician is relevant if used to demonstrate that the risk was understated.[5]

Finally, we agree with Kokemoor that the court erred by admitting evidence that he should have advised Johnson that better surgeons and facilities were available to her, and that he should have referred her to these doctors and facilities. For example, Doctor Haring Nauta testified for Johnson that, in his expert

---

[5] Moreover, even if the patient does not inquire of the physician's experience, the physician's duty remains to make such disclosures as appear reasonably necessary under the circumstances to enable a reasonable person to intelligently exercise his or her right to consent or refuse. While this case does not present the issue, because the patient did inquire, a strong argument can be made that a reasonable patient, ignorant of the fact that she is dealing with an inexperienced surgeon or a surgeon with a very bad track record, would want to know the risks with the surgeon performing the surgery, not merely the average of a community sample.

opinion, Johnson should have been referred to a tertiary care center due to the difficulty of the procedure and the expertise provided at such centers.[6] He testi-

[6] As other examples, Dr. Robert Narotzky testified that Kokemoor's total aneurysm experience was very limited. He suggested that Johnson should have been referred elsewhere to someone with more experience in dealing with her problem. He also opined a reasonable doctor has a duty to examine his own statistical success rate, determine whether the patient's risks are identical to those with another doctor and, if not, the patient should be given the option of being referred.

Doctor Fredric Somach testified that someone with lesser experience should not undertake this procedure but should refer the patient to an established expert. When his answer was stricken as nonresponsive, he was asked what Johnson should have been told, and responded that she should have been told of very experienced surgeons in the immediate area and that she should have been referred to one of these surgeons, or at least told to seek a second opinion from them.

Johnson asked Kokemoor similar questions. He was shown quotations from various journals that recommended basilar bifurcation surgery be performed at tertiary care clinics by experienced surgeons. Kokemoor admitted to not advising Johnson of the substance of these quotes. The following exchange is typical of the questions he was asked in this area:

Q: Now, you didn't tell Donna anything about the pros and cons of where she could have this surgery, did you?

A. No.

Q. And you didn't tell her anything about the availability of more experienced aneurysm surgeons within three hundred miles of Eau Claire, did you?

A. No.

. . . .

Q. And you did not tell her that at Mayo Clinic about two hours away, that there were surgeons who were doing roughly fifty aneurysm surgeries a year?

A. No, I didn't.

fied that a surgeon should always advise of the availability of more experienced surgeons given the difficulty of the procedure and that it is unfair to fail to discuss referral. Other experts made similar comments. The court's order on motions in limine specifically allowed this type of testimony.

Nothing in Wisconsin's informed consent law suggests that the duty to disclose a procedure's inherent risks includes advising of the availability of, and making referral to, more experienced surgeons and better hospitals. While other states recognize a duty to refer, they do so as a separate cause of action from a duty to inform. *See, e.g., Larsen v. Yelle*, 246 N.W.2d 841, 845 (Minn. 1976). In those jurisdictions, a general practitioner has a duty to discover that the patient's ailment is beyond the doctor's knowledge or skill and to refer the patient to a specialist. *Id.* Causation is proven differently from duty-to-inform cases. If the doctor undertakes treatment when he should refer to a specialist, the doctor is only liable if treatment was below the standard of care of the specialist. *Id.* Thus, the patient must show the injury was caused because the doctor actually failed to perform at the level of care, skill and knowledge of a specialist. *Id.*

The parties agree Wisconsin has not yet recognized a duty to refer, and whether it should is not before us now. We do hold, however, that it is error in a case premised on failure to obtain informed consent to admit evidence that a doctor should have advised of and referred the patient to better doctors and facilities. Such evidence is directed at whether a doctor is negligent in undertaking a procedure and thus is irrelevant to determining whether the patient was aware of a

procedure's risks. There is a serious danger the jury may confuse a duty to provide average quality care with a duty to adequately inform of medical risks.

This evidence may also affect the jury's causation determination. Causation in duty-to-inform cases only requires proof that the patient, properly informed, would not have undergone the procedure. Plaintiff need not prove the doctor lacked the skill to perform the procedure. However, if a jury finds a doctor breached a duty to inform because the patient was not advised of and referred to better surgeons and facilities, then duty-to-inform causation automatically follows; a patient so informed would almost certainly forego the procedure with that doctor.

While the jury's finding that Kokemoor breached his duty to inform is supported by properly admitted evidence,[7] we conclude that there is a strong possibility that the improperly admitted evidence influenced its causation finding. There was evidence the jury could use to find that the average risk of this surgery was 15% while the risk with Kokemoor was 20% to 30%. The special verdict given by the court asked whether a reasonable person in Johnson's position would have refused surgery with Kokemoor if she had been

---

[7] Kokemoor told Johnson that the morbidity and mortality risk of her procedure was only 2%, when the risk was higher than 15% and approaching 20-30%. He told her that the procedure was less risky than an angiogram, when in fact it was significantly riskier. He told her that the procedure's risks were comparable to a tonsillectomy, appendectomy and other routine procedures, when in fact her procedure was not routine. Finally, Johnson twice inquired into Kokemoor's experience with the specific procedure. Kokemoor told her he had performed the surgery dozens of times, when instead he had clipped only two other basilar bifurcation aneurysms before.

224

informed of the risks and advantages of surgery. The jury answered this question "yes." There is a strong possibility it did so because it believed that if Johnson had been told of and referred to other physicians and hospitals, then she would not have chosen surgery with Kokemoor. Johnson's counsel argued this point extensively at closing arguments.

Some of counsel's arguments include the following:

> Now, why, if it's not an emergency, if there are, in fact, pros and cons about where you do the surgery; if, in fact, ninety miles away at Mayo Clinic there is a world-leading expert on aneurysms; if, in fact, within three hundred miles of Eau Claire there are lots of places where there are surgeons with wide aneurysm experience, if all those things are true, why didn't Donna go to one of those other places?
>
> The reason is she wasn't told those things . . . .
>
> . . . .
>
> This woman was misled. She certainly was misled in the extent to which she was not told things that she needed to consider before she decided where she was going to have the surgery. She wasn't told anything about the other places where this surgery could be done.
>
> . . . .
>
> Now, people who are interested in the surgery, if they're told all of the facts, are going to know I can have surgery with Dr. Kokemoor, the solo practice, small-town neurosurgeon or I can have surgery at Mayo Clinic or at some other major medical center around the country with someone who does these a lot, someone who has a proven record.
>
> So the three choices, no surgery, surgery with Kokemoor or surgery at a center, Dr. Kokemoor's going to come in third every time. . . .

225

. . . You know, it's really a little bit like going to the horse races and you've never been to the horse races before . . . .

Now, if somebody who's been there and knows the story tells you in gate one is the old gray mare and in gate two is Secretariat, where you going to put your money?

These arguments are highly persuasive. They are also improper in context of our conclusion that the duty to inform does not include a duty to advise of and refer to better surgeons and medical centers. We conclude that there is a significant and reasonable possibility the jury relied on the inadmissible evidence and arguments in finding that Kokemoor caused Johnson's injuries. We therefore reverse and remand for a new trial.

The dissent gives several reasons why the referral evidence was harmless. First, it refers to the "significantly reduced risk of a bad result" from the proposed surgery with others. The jury, however, heard that the risk with the best surgeons was 10%, with experienced surgeons was about 15%, but was 20% to 30% with Kokemoor. Reasonable jurors may differ whether these approximated percentages would have been sufficient to cause a reasonable person in Johnson's position to refuse to consent to surgery with Kokemoor.

Further the dissent refers to a concession by Kokemoor's attorney at oral argument. Counsel merely responded to a lengthy hypothetical question from the court. He responded that if this court approved of receipt of all of the evidence except the referral evidence, the latter "may well be harmless." We should require a concession to be unequivocal and deliberate if

226

it is to serve as a basis to deny the relief sought on appeal.

Where the trial court itself orders a new trial, the scope of the new trial is discretionary with that court. *Badger Bearing, Inc. v. Drives and Bearings, Inc.*, 111 Wis. 2d 659, 673, 331 N.W.2d 847, 855 (Ct. App. 1983). We see no reason to apply a different rule here where this court orders a retrial. The evidence was overwhelming that Kokemoor did not adequately inform Johnson. We therefore defer to the trial court whether to resubmit for trial the "duty" question, that is, the issue of whether he adequately informed her, or whether to retry only the "cause" question.

*By the Court.*—Order reversed and cause remanded for a new trial.

MYSE, J. (*dissenting*). I respectfully dissent from that portion of the majority opinion which finds that the trial court committed prejudicial error when it received evidence regarding Dr. Richard Kokemoor's duty to refer Donna Johnson to other physicians. While I agree that Kokemoor did not have a duty to refer Johnson to other physicians as an element of an informed consent claim, the receipt of such evidence was harmless error. I reach this conclusion for three reasons.

First, the evidence regarding other physicians and their rates of success was properly before the jury as part of the true risk Johnson faced in undertaking the operation proposed by Kokemoor. Because the jury was aware that there were other physicians who enjoyed a significantly reduced risk of a bad result from the pro-

227

posed surgery, the introduction of referral opinions is unlikely to have affected the jury's determination.

Second, the majority believed that the improperly admitted referral testimony is likely to have influenced the jury solely as it related to the causation question of whether Johnson would have undertaken the proposed surgery had she understood the true risk. The evidence properly before the jury demonstrated that the surgery proposed by Kokemoor bore a 20-30% risk of a bad result. If Johnson did nothing she faced a 2% per year cumulative risk that the aneurysm would rupture. A bad result in this proposed surgery involved either death or the type of substantial disability that could result, and did result, in paralysis, loss of bowel and bladder control, speech and vision impairment and loss of body motor coordination. I seriously question what a reasonable person would do if faced with a 20-30% risk of such catastrophic proportions when waiting for better techniques, new medications or other medical innovations involved only a 2% per year cumulative risk. Even if Kokemoor's failure to disclose the substantial risk of death or disability caused Johnson to refrain from seeking a second opinion from a doctor more experienced with this type of aneurysm, Johnson would be entitled to prevail because she would not have undertaken the risk of the operation proposed by Kokemoor. The evidence seems compelling that Johnson would not have undertaken the operation if Kokemoor had disclosed the true risks. I cannot conclude that reference to referrals to other physicians had any substantial impact on the jury's deliberation on this issue.

Third, during oral argument Kokemoor's attorney conceded that if the court properly received the results of other physicians' experiences with this operation as

part of the evidence directed at proving that Kokemoor did not accurately identify the true risk of the proposed operation, the receipt of referral evidence would not be prejudicial error. Counsel properly reasoned that the evidence was before the jury as part of the proof of the true risk and would not have influenced the jury's determinations of the questions submitted to them on the special verdict. In view of this concession, I see no basis for reversing this judgment.